THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* FRANCISCO ALSINA RIVERA, Defendant and Appellant.

No. 15622. Argued February 10, 1956.—Decided March 28, 1956.

*Santos P. Amadeo* and *Rafael V. Pérez Marchand* for appellant. *José Trías Monge, Attorney General,* and *Jaime García Blanco, Special Fiscal of the Supreme Court,* for appellee.

MR. JUSTICE SIFRE delivered the opinion of the Court.

Francisco Alsina Rivera has appealed from three judgments in which he was sentenced to life imprisonment for the crime of first-degree murder and to six-month jail sentences in two other cases for carrying a prohibited weapon and for a violation of the Firearms Registration Act. In his brief he assigns and discusses only the errors which the trial court allegedly committed in the murder trial. In the latter he was tried by a jury. The information therein charged him with having "illegally, voluntarily, and maliciously, with premeditated malice, deliberately, and a resolute and firm purpose to kill, thereby showing that he had a perverted and malignant heart, treacherously and criminally assaulted and battered Aida Acosta Cancel, a human being, with a revolver, firing several shots and inflicting serious bullet wounds upon her which resulted in her death . . ." Upon arraignment, Alsina Rivera pleaded not guilty "by

reason of insanity." He made the same plea in the other two cases,[1] which were tried by the court without a jury.

In the trial for murder, the prosecution offered evidence to show that the defendant and his wife, Carmen Alvarado, occupied a room in the apartment of Milagros Orsina widow of Espina, situated at Stop 22 in Santurce, and that on January 4, 1951, the former went peacefully and quietly to the room of Aida Acosta Cancel, daughter of the widow of Espina, told her that his wife wanted to see her, and asked her to come to see her. Aida consented and went to Carmen's room. Alsina Rivera followed her and shot her several times in the back, killing her. Upon hearing the shots, the widow of Espina screamed, "Paco, you have killed my daughter." The defendant then fired two more shots. He then left the house, stopped for a moment at a soft-drink establishment, and finally took a taxi. While riding in the taxi, he asked the driver to take him to Cayey. The driver answered that he needed permission from his office. Thereupon appellant ordered him to take him to the Clínica Juliá. Upon reaching that institution, the driver asked him to pay the fare, to which Alsina answered, pointing a revolver at him: "There are two bullets left, one for you and another for me." In view of this situation, the driver decided to go to police headquarters at Stop 19, which he did, returning to the clinic with several police officers. There the defendant handed the weapon to Dr. Juan Homedes, who opened it and found that four bullets had been discharged and two had not.

The prosecution also presented evidence to show that about a month before the foregoing event, the defendant went to Cayey where he obtained the revolver in question;

---

[1] Under § 151 of the Code of Criminal Procedure, 1935 ed., "The only pleading on the part of the defendant is either a demurrer or a plea." 34 L.P.R.A. § 36. The special defense of insanity does not exist as such in Puerto Rico. The question may be raised in connection with a plea of not guilty.

and that two weeks before these events occurred, he had told a witness, Ángela Falú Torres, that Aida Acosta was meddling in his and his wife's affairs. There was no evidence that Aida Acosta meddled in the marital relations of Alsina and his wife.

The defendant presented no evidence to prove that he did not take Aida Acosta's life. On the contrary, he admitted the facts but pleaded that he was innocent because he was incapable of committing an offense, and presented evidence to show that he was insane at the time he committed the act in question.

The evidence on this point showed that the defendant, an Army veteran, had been confined in the Rodríguez Hospital from November 10, 1947 to December 3 of that year "for schizophrenia," and in the Clínica Juliá, for the same reason, on four occasions prior to this occurrence. The last time he was so confined was during the period between January 13, 1950 and March 6 of that year, when he was discharged at his tutor's request and against the better judgment of the attending physician, who advised that the patient "should be considered mentally incompetent . . ." The diagnosis was at all times schizophrenia, marked by delusions of persecution, auditory and visual hallucinations, and spells of excitement accompanied by aggressiveness, mental confusion, and inadequacy of judgment.

The defense introduced evidence of experts to prove that the defendant was mentally ill before he took Aida Acosta's life, at the time he did it, as well as thereafter. A psychiatrist, Dr. Ramón H. Señeriz, testified that Alsina Rivera left the Clínica Juliá in spite of his objection, based on the fact that the former "had not recovered from his psychotic condition." He stated that after January 4, 1951, he had the opportunity "to examine the patient . . . on several occasions . . . ," having reached the conclusion that about the middle of February 1951 and thereafter "the psychotic

symptoms referred to above were still present," as well as delusions of persecution, auditory hallucinations, spells of excitement accompanied by aggressiveness, etc., "which means that the patient was still ill, mentally ill," there not being "any change in his diagnosis—schizophrenia— which was made in 1947." About the middle of August 1952, Dr. Señeriz was able to observe that Alsina Rivera had a remission of his symptonms. He explained the meaning of this: "The state of remission of symptoms in a mental disease which we call psychosis, in this case schizophrenia, means that the individual is in full control of his mental faculties." [2] Although the witness was unable to assert that appellant was mentally incapacitated when he committed the act for which he was on trial, he did testify, in answer to a hypothetical question of the defense, that "my opinion is that a person such as has been described by his acts was in all likelihood acting under delusions of persecution."

Another psychiatrist who testified as an expert for the defense was Dr. Ramón Fernández Marina. He testified that he knew the defendant, who had been his patient in the Insular Psychiatric Hospital since February 17, 1951, suffering from "schizophrenia of a paranoid type" which lasted until the early part of October of that year, and that subsequently he had a recurrence. He explained that this mental disease "is characterized by the symptoms just described by Dr. Señeriz—hallucinations, auditory and visual, they hear voices, they hear things or they are told to do things; they believe that the people, for example, are against them." Upon being asked, "Can a person in that condition, acting under a delusion of persecution, commit a crime in the belief that such act is correct?", he answered: "Exactly," and added: "A person, for example, may be asked whether it is wrong to kill and he says it is wrong to

---

[2] The trial began on August 26, 1952. The defendant was examined by Dr. Señeriz who certified that Alsina Rivera was in a condition to stand trial at that time.

kill; but if the question is whether it is wrong to kill in self-defense, he says it is not wrong to kill in self-defense because the patient believes he is being persecuted, that when he kills, he kills in self-defense, and he believes it is not wrong to kill at that time." Upon being asked, "Does that mean that at that moment that man is incapable of distinguishing between delusion and reality?", the witness answered in the affirmative. In the opinion of this psychiatrist, "in Alsina Rivera's case the prognosis is ominous as to complete future recrimination," and the acts of violence committed by him—he attempted to assault his wife after January 4, 1951 while hospitalized—"are prompted by his delusion of persecution."

The last person to testify was Dr. Juan Homedes, Director of the Clínica Juliá. He had already testified as a prosecution witness. He stated, briefly, that the appellant, between 12 and 12:15 p.m. of January 4, shortly after firing the shots, appeared at the clinic with a revolver in his hand. Realizing "the condition of our patient" —meaning the defendant—the witness put his arms around him, "an embrace prompted by these circumstances, as a precaution by one who cannot avoid a situation—that was I. As I greeted him affectionately, I pointed to the object in his right hand and asked him to hand it to me. It was a black revolver which he promptly handed to us saying that he had in fact come to give it to us, that he would not give it to anyone else." Dr. Homedes further testified that Alsina Rivera had said "That he had just killed his wife and three or four other persons . . . , that he had been forced or impelled to do what he thought he had done as a result of the interference of certain persons, of some neighbors who were bent on breaking up his marriage, breaking up his home, blemishing his wife's reputation, and that he would not tolerate that situation from anyone, including us, 'not even you, doctor;

if you incriminate or intend to break up our marriage, we will not permit it either.' " The witness also testified: "Our reaction was, in fact, to tell him that we did not believe he had killed anyone . . . and we tried to divert his delusive trend from a fixed idea in his mind. Suspecting that we did not take his words to mean what he intended, he first tried to take back the weapon which he had handed to us, at our request, to show us that he had fired five shots. He said: 'Doctor, I am stained with blood,' and we then said, 'Where are you stained with blood?' 'My pants, my shoes, look,' and we looked and did not see any blood."

After referring to his meeting with appellant and to the occasions when he was hospitalized in the Clínica Juliá, Dr. Homedes expressed his opinion that "on that day and moment," referring to the time of the events, "patient Francisco Alsina Rivera was mentally ill," insane, as this term is used in "common parlance," acting "like an actively mentally ill person." [3]

---

[3] We transcribe part of the examination by the defense:

"Q.—When the defendant told you, in order to convince you, that he had killed and you told him he had not, for technical reasons, how do you describe in psychiatric terms his insistence that he was stained with blood when in fact he was not?

"A.—Those, in fact, are delusions made manifest by hallucinations. If he sees and insists that he is stained with blood and a witness, in this case the speaker, takes a look and does not see any stains, the inference is that the patient is seeing things which do not exist.

"Q.—Because of his type of illness and at the moment and under the circumstances in which you saw him, could this patient also hear things which were not actually said?

"A.—He could, since this man, because of his delusions of persecution, had the idea that he was the victim of someone who was his friend.

"Q.—Could he, absolutely?

"A.—That man could think, he could even attempt or plot the destruction of his best friend, believing in his delirium that he had become his enemy.

"Q.—Could he do it?

"A.—Within the logic of susceptible science, this man was capable of

The prosecution presented no direct evidence to prove that the accused was sane when he took Aida Acosta's life. It relied on the presumption of sanity and on a medical certificate issued on July 7, 1950, approximately five months prior to the occurrence, which is transcribed in a marriage license, wherein the doctor certified that the defendant was not suffering from "insanity, epilepsy, idiocy, or any venereal disease" which would prevent him from contracting marriage.

The foregoing is a brief résumé of the evidence offered by the parties.

After the jury returned a verdict of guilt in the murder case, the trial court set a date for sentence in that proceeding as well as in the cases for carrying a prohibited weapon and for violation of the Firearms Registration Act. It was unable to do so at that time because "The defendant suffered an attack of apparent hysteria, it having been necessary to call several persons to subdue him." The court ordered that Alsina Rivera be confined in the Psychiatric Hospital "until the staff of that institution submits a report that the defend-

---

imagining that his wife was molested by strange persons when nobody was in fact concerned about her.

"Q.—Could this man in that delirium plan his own destruction, that of his wife and of all his acquaintances in the belief that he was being persecuted?

"A.—He could attempt to carry out all those acts.

"Q.—Could a man affected by schizophrenia, as mentioned in this case, conceive a plot against him and consequently devise a plan to destroy those who plotted against him, even if it were fanciful?

"A.—He could perfectly well.

"Q.—What about a man who acts so calmly, and with such cold-bloodedness, and under the circumstances in which you saw Francisco Alsina that day, insisting that he had killed his wife and four other persons; how can you explain his reaching that state, that crisis; for what reasons does that man create a situation in which he decides to destroy everything in order to reconstruct his home and his life? How do you explain that in psychiatry, that we may understand it? Why does an individual tend to confuse himself in that way? What is there in

ant is in condition to be sentenced."[4] Appellant was discharged early in October 1952 after a short period of confinement, and on the 22d day of that month and year, while he was apparently in a state of remission, the three judgments appealed from were entered.

 We repeat that the defendant assigns and discusses only the errors which, in his judgment, were committed at the trial of the murder case. In the first two assignments he complains of the instructions given to the jury "on the defense of insanity." The lower court gave, among others, the following instructions: "The facts alleged by the prosecuting attorney must be proved beyond a reasonable doubt; *those alleged by the defense in this specific case must be proved by a preponderance of the evidence:* . . . The defendant has alleged that, although he did kill the person mentioned in the information and attempted to take the life of another human being, he is not guilty, alleging that he was mentally incapacitated when he committed those acts; in other words, that he is innocent since he was unable to distinguish right from wrong when he committed those acts, and was insane. The law exempts from criminal responsi-

---

the man or in the environment which thus makes a man go astray and apparently makes him bad when he is not?

"Prosecuting Attorney Viera: Which of the three questios do you wish the witness to answer?

"Defense: The three, if possible.

"Prosecuting Attorney Viera: Objection to two.

"Hon. Judge: Please simplify the question; the question was too long, after making explanations. Will you repeat it.

"Prosecuting Attorney Viera: All right.

"Defense:

"Q.—Doctor, what pathology, what mental process took place that day in the defendant, or led defendant to that crisis, to those conclusions?

"A.—The condition we find in patient Francisco Alsina Rivera and the acts committed by him, of which we learned later, from a psychiatric point of view are perfectly logical if we bear in mind the essence of the mental disease which for years had affected the patient and which undoubtedly was active at that moment. I wish to state clearly and without mental reservation that in the way I saw Francisco Alsina Rivera on January 4, 1951, he was acting like an actively mentally ill person."

[4] Minute Book F-29, minutes of September 3, 1952.

bility the insane, maniacs, lunatics, and idiots, a mentally diseased person who does not realize what he is doing when committing a criminal act, who is incapable of telling whether such act is right or wrong. The law exempts him from responsibility, and it is therefore the jury's duty to find the defendant not guilty if in its judgment he was in those conditions at the time of committing these acts. The gentlemen of the jury *shall determine whether those circumstances have been proved which show that the defendant was insane at the time of perpetrating the crime; that he was insane at the time of committing those acts.* In criminal actions for felony, sometimes the defendant sets up the defense of mental unsoundness to be excused from responsibility for the criminal act charged, and, therefore, such defense has become of utmost importance in the criminal jurisprudence. The due consideration and respect for the aims of justice, as well as for the peace and well-being of society, no less than the consideration due the accused, makes it imperative that the jury weigh and consider carefully such defense. It is a defense which is used at times without justification, in cases in which the evidence offered is so complete as to render futile the presentation of any evidence or other sort of defense; but it should not be considered ingenious and deceitful. *It is a legitimate defense when it is proved beyond any doubt, by a preponderance of the evidence, that the defendant was affected by a mental disease which incapacitated him at the time of committing the acts for which he is on trial.*"

The court also gave this instruction: "You are further instructed that the law presumes that every person is sane, and it is not necessary for The People to present evidence of mental soundness in the first place. However, *where in a criminal action there is presented some evidence* as to the mental unsoundness of the defendant, The People is bound to establish the fact of the defendant's sanity as well as

any other fact which the State is bound to prove to obtain a conviction. . . ." (Italics ours.)

The judicial precedents are in open and marked discrepancy, which can not be reconciled, as to the test applicable to the burden of proof as respects the capacity or incapacity of the accused to incur criminal responsibility at the moment of perpetrating the act charged. In some twenty states the prevailing doctrine, which had its origin in England as an aftermath of defendant's acquittal in the famous *M'Naghten case*, 10 Clark & Fin. 200, is that insanity is an affirmative defense which the accused is required to establish. In an almost equal number of states the courts repudiate that doctrine, holding that, in view of the fact that mental soundness is essential to constitute crime, the State has the burden of proving that the defendant was mentally capable of forming the criminal intent required to render the act charged a criminal act. Of course, according to the latter rule, as long as mental soundness is not questioned by the presentation of evidence, the presumption of sanity relieves the State of the duty to offer evidence on the defendant's sanity.

The decisions which consider insanity as an affirmative defense to be established by the accused are at variance as respects the quantum of the evidence which must be presented in order to establish it. In several old cases it was held that the accused was bound to prove it beyond a reasonable doubt, a theory which has been abandoned in all jurisdictions, except the State of Oregon, where it prevails by virtue of a statute. Some courts require evidence of insanity "to the satisfaction of the jury." Others require that it be established by the accused, "to the satisfaction of the jury, by a preponderance of the evidence," and some, "reasonably satisfactory." The prevailing rule is no doubt that he should prove it by a preponderance of the evidence. As to the rule that it is incumbent on the State to establish the mental soundness, it may be said that, except for the

decisions of one or two states, of the Supreme Court of the United States, and of the District of Columbia, according to which it is sufficient to offer *some evidence* on the absence of sanity to bind The People to establish sanity, the generally accepted rule is that that duty falls upon the State, if the evidence is sufficient to create a reasonable doubt in the trier's mind on the accused's responsibility. In such case, the State is bound to establish mental capacity beyond a reasonable doubt, just as it must do with respect to any other fact.

In view of what has been stated above, let us examine briefly the above-quoted instructions given by the trial court.

As has been noted, the court instructed the jury that, while it was the prosecuting attorney's duty to prove beyond a reasonable doubt the facts charged, *it was incumbent on the accused to prove that he was insane when he took Aida Acosta Cancel's life*, thus shifting the burden to him to prove his incapacity, and adopting one of the two rules sanctioned by the judicial precedents. However, in so doing it instructed the jury on one hand, that Alsina Rivera was bound to convince it of his lack of mental capacity by a *preponderance of the evidence*, and, on the other hand, that in order to do so he was bound to establish the insanity beyond any doubt. It next gave an instruction to the effect that, after *some evidence*, of insanity was presented, The People was bound to prove "the fact of the sanity . . . as well as any other fact which the State is bound to prove in order to obtain a conviction." In that instruction the court apparently adopted the rule which puts on the State the burden of proving ultimately mental capacity.

It is evident that the first two instructions are inconsistent and irreconcilable with each other, and likewise that they conflict with the latter rule, a conflict which is also irreconcilable, since it is not possible to reconcile the rule which imposes on the accused the burden of proving his

insanity with the rule which makes it the duty of the State to prove beyond a reasonable doubt mental capacity to incur responsibility whenever evidence is presented putting it in issue. In view of these circumstances, the inevitable conclusion is that the jury was without guidance as to the rule it ought to follow in its deliberations in the process of considering and weighing the evidence on insanity, of utmost importance in this action, and was left completely free to decide the confusion in which it was placed, choosing whimsically and arbitrarily between conflicting rules; in other words, the jury was left free to determine which rule was applicable as to the burden of proof, a function which belonged exclusively to the trial judge.

■ The error just noted, being of a fundamental character, cannot be overcome by resorting to the rule that reversal will not lie whenever the instructions, taken as a whole and jointly, are sufficient and adequate. Those given in the case at bar do not permit the application of that rule. Neither can we overlook that error merely because the instructions were not specifically challenged, or because no special or additional instructions were requested. The defendant, for example, could have been convicted (and who could be certain that he was not?) because the jury believed that he had the burden of proving insanity at the time of taking the life of Aida Acosta, and that the act of killing was the result of his insanity, that is, because the jury adopted one of the rules on which it was instructed, which is highly prejudicial to appellant, and which cannot be sanctioned by this Court because it is the least rational, the most unfair, and which in a high degree departs from the cardinal and basic principles of our trial system.[5]

---

[5] No one could guarantee that the jury did not weigh the evidence in the belief that the defendant was bound to establish his mental incapacity, not just by a preponderance of the evidence, but beyond a reasonable doubt, the latter rule being the most stringent within the norm which requires the accused to establish his irresponsibility.

This rule means that the question of guilt and the question of mental unsoundness raise two distinct issues, and that, while both may be involved in the verdict, the burden of proof as to the first is on the prosecution, while as respects the second it is on the defendant, considering insanity as a defense which he must establish, the natural consequences being to shift the burden to the defendant to prove his innocence by showing that he is not guilty of the criminal act charged, and to permit his conviction even if the jury may have a reasonable doubt as to his mental soundness, *State v. Quigley*, 26 R. I. 263, 58 Atl. 905; *People v. Ward*, 105 Cal. 335, and hence, regarding his capacity to form the criminal intent to offend, which results can not be reconciled with the presumption of innocence favoring and protecting every defendant until the State proves his guilt beyond a reasonable doubt.

 We cannot sanction a rule which leads to the results noted and which is predicated on a misconception of the law. In our opinion, the rule of evidence which should govern when the question of insanity is raised to excuse from responsibility is this: The law presumes that sanity is the normal condition, a presumption which is justified by human experience and by considerations of public policy, and, hence, that the defendant was of a sound mind when he committed the act charged as an offense. By virtue of that presumption, The People is not required to offer any evidence to show that the defendant was sane at that moment, *unless* evidence is offered and received which may create a reasonable doubt as to sanity, which evidence must be furnished by the defendant if he relies on the absence of mental soundness for exemption from responsibility, but which may also develop from the evidence offered by The People when presenting its case. *Davis v. United States*, 160 U.S. 469; *Pribble v. People*, 49 Colo. 210, 112 Pac. 220; *Blocker v. State*, 92 Fla. 878, 110 So. 547; *Walters v. State*,

183 Ind. 178, 108 N. E. 583; *State* v. *Johnson*, 92 Kan. 441, 140 Pac. 839; *State* v. *Green*, 78 Utah 580, 6 P. 2d 177. However, once there is evidence capable of creating that doubt, the presumption that the defendant was sane at the time of committing the act is overcome and the State is required to prove sanity as well as any other fact. After weighing the entire evidence as to the act charged and as to insanity, the trier is required to determine whether the prosecution has established defendant's sanity, his capacity to commit a crime, and, if it then entertains reasonable doubt, it is under the duty to give the benefit of that doubt to the defendant and to acquit him. *Martz* v. *People*, 114 Colo. 278, 162 P. 2d 408; *Britts* v. *State*, 158 Fla. 839, 30 So. 2d 363; *People* v. *Jenko*, 410 Ill. 478, 102 N. E. 2d 783; *Limp* v. *State*, 228 Ind. 361, 92 N. E. 2d 549; *People* v. *Eggleston*, 186 Mich. 510, 152 N. W. 944; *Williams* v. *State*, 205 Miss. 610, 39 So. 2d 3; *State* v. *Moore*, 42 N.M. 135, 76 P. 2d 19; *Gallagher* v. *State*, 81 Okla. Crim. 15, 159 P. 2d 562.[6]

We repudiate in this opinion the rule of evidence which is due in great measure to the fear that insanity, being a condition which can be easily feigned, is likely to be resorted to by offenders as a subterfuge to escape punishment. As ably stated by Weihofen, the value of this argument, in the

---

[6] In *People* v. *González*, 69 P.R.R. 533, we stated, in referring to self-defense:

"A person invoking self-defense is bound to prove it, unless the evidence for the prosecution discloses said defense. It is the prosecuting attorney, however, who from the beginning to the end of trial has the burden to establish defendant's guilt beyond a reasonable doubt. The defendant is not bound to establish beyond a reasonable doubt that he acted in self-defense, simply because it would amount to requiring him to establish his innocence, and every defendant is presumed to be innocent until proved guilty. Consequently, it suffices that evidence in support of self-defense considered in connection with all the evidence carries to the minds of the jury a *reasonable doubt* as to whether defendant acted in self-defense, to entitle the accused to the benefit of the doubt and it is the duty of the jury to bring a verdict of not guilty. *De Groot* v. *United*

light of the present state of psychiatric knowledge, is highly questionable, and, as a proposition of law, the argument has been wholly rejected by the United States Supreme Court. Weihofen, *Mental Disorder as a Criminal Defense*, p. 220. The court so stated in the following language, which is indeed very eloquent: [7]

"It seems to us that undue stress is placed in some of the cases upon the fact that, in prosecutions for murder the defence of insanity is frequently resorted to and is sustained by the evidence of ingenious experts whose theories are difficult to be met and overcome. Thus, it is said, crimes of the most atrocious character often go unpunished, and the public safety is thereby endangered. But the possibility of such results must always attend any system devised to . . . punish crime, and ought not to induce the courts to depart from principles fundamental in criminal law, and the recognition and enforcement of which are demanded by every consideration of humanity and justice. No man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them, . . . is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged."

The rule which puts on the defendant the burden of proving his insanity has likewise been rejected by the United

---

*States*, 78 F. 2d 244 (C.C.A. 9th, 1935) ; *Frank* v. *United States*, 42 F. 2d 623 (C.C.A. 9th, 1930)."

And in *People* v. *Carrero*, 71 P.R.R. 566, we stated with respect to the defense of alibi that:

"Undoubtedly both of the instructions copied above, insofar as they refer to the reasonable doubt in connection with the defense of alibi, are erroneous and prejudiced substantial rights of the defendant. The defendant was entitled to the benefit of the doubt in the event that a reasonable doubt arose in the minds of the jury with respect to whether or not he was at the scene of the crime when it was committed. For the same reason the lower court erred in not giving the special instruction requested by the defendant. *Reavis* v. *United States*, 93 F. 2d 307 (C.C.A. 10, 1937) ; *People* v. *McCoy*, 153 P. 2d 316 (Cal. 1944) ; *Goodall* v. *United States*, 180 F. 2d 397 (C.A., D.C. 1950) ; *People* v. *Intersimone*, 266 App. Div. 280 (N.Y. 1943) ; *Cf. People* v. *González*, 69 P.R.R. 533."

[7] *Davis* v. *United States, supra.*

States Supreme Court in *Davis* v. *United States, supra,* by the courts of the District of Columbia, and by the courts of Arizona, Colorado, Connecticut, Florida, Idaho, Illinois, Indiana, Kansas, Massachusetts, Michigan, Mississippi, Nebraska, New Hampshire, New Mexico, New York, Oklahoma, Tennessee, Utah, Vermont, Wisconsin, and Wyoming, among others, and is losing advocates with the passing of time. In this connection, Weihofen says at p. 238 of his work *supra:* "There has been a decided difference of opinion concerning the trend of the American jurisdictions toward one or the other of the burden of proof rules," adding that "An examination of the cases and statutes reveals that the tendency has been, and still is, to require a decreasing amount of evidence to entitle a defendant to an acquittal on the ground of insanity."

No one denies that the lack of capacity to commit a crime exculpates a person from punishment. This is recognized by the legislation of all civilized countries. Although, fortunately, sanity is the normal condition, the reality of life unfortunately shows that the human being is not always sane and that at times is affected by mental derangement, which may and does at times lead him to commit acts which are contrary to law. It is absurd and certainly unfair to admit such a reality and then to impose handicaps that destroy the value of insanity as a defense, motivated in part, either by the fear, as already noted, that the disease be used deceitfully, feigning insanity, or by the risk that a verdict of acquittal may set free a person who might be a social menace. Perhaps this danger exists here, and it would warrant a revision of our legislation to ascertain if it does exist, but it could be easily averted, as has been done in all the states, by measures whereby a defendant who is acquitted on the ground of insanity is not automatically set at liberty, but is committed to an insane asylum where he remains until he can be restored to normal life without

danger.[8] In any event, these fears cannot justify a violation of fundamental and basic principles of justice which, like the presumption of innocence, constitute real guarantees of personal security.

■■ In order to orientate the lower court in the new trial for murder, we turn to the question raised by the third assignment challenging the following instruction given to the jury: "Before the lack of mental capacity may excuse one from criminal responsibility, it must impair the mental faculties so far that the mind can not judge between right and wrong with respect to the act committed at the time of its perpetration. There must be a lack of knowledge that an act *is wrong in a moral or legal sense* in order to escape criminal responsibility." (Italics ours.)

Appellant maintains that the test "provided by law for determining the insane person's criminal responsibility is whether he has knowledge of the act in its moral rather than in its legal sense . . . ," and that the lower court erred in including the lack of knowledge that the act was wrong as being contrary to law. His contention is based on the following provisions of § 39 of the Penal Code:

"All persons are capable of committing crimes except those belonging to the following classes:

" . . . . . . . .

"4. Lunatics. Lunatics and insane persons; but a morbid propensity to commit prohibited acts, existing in the mind of a person who is not shown to have been incapable of knowing the wrongfulness of such acts, forms no defense to a prosecution therefor."

These provisions in effect incorporate the so-called right and wrong test, according to which the accused is mentally

---

[8] In his work on *Mental Disorder as a Criminal Defense*, at p. 365 *et seq.* Weihofen sums up the legislative provisions enacted in the States to avert the danger pointed out, stating that "when a defendant is acquitted on the ground of mental irresponsibility, statutes provide for certain steps to be taken to secure his commitment as an insane person," adding that "nowhere is the defendant simply set at liberty."

irresponsible if his mental soundness at the time of committing the act charged was affected by insanity to such a degree as to render him incapable of distinguishing between right and wrong in respect to such act, that is, to realize the wrongfulness of such act.

That is the rule that prevails in a great majority of the States,[9] notwithstanding the fact it has been the object of severe criticism which has grown in recent years, perhaps due to the belief that, in spite of its flaws, no better rule can be devised, a theory not shared by many jurists and psychiatrists and which some courts have rejected, among them, many years ago, the Supreme Court of New Hampshire, *State* v. *Pike*, 49 N. H. 399; *State* v. *Jones*, 30 N. H. 360, and the United States Court of Appeals for the District of Columbia Circuit, *Durham* v. *United States*, 214 F. 2d 862, decided in 1954 by an opinion which without doubt constitutes a contribution of extraordinary value in the study of the problem at hand.[10]

---

[9] It has been liberalized in a number of them, recognizing as an excusing factor of responsibility the irresistible impulse caused by mental disease. Our legislation does not recognize this, which apparently is without justification in view of the truths revealed by the progress made in the field of psychiatry.

[10] The Supreme Court of New Hampshire has rejected all the legal tests for determining mental responsibility, holding that the question of responsibility or irresponsibility is one of fact for the jury, and that the only rule that the court can give the jury is if the defendant had a mental disease, and if the act charged was the product of that mental disease, it must acquit him. This rule rests upon the principle that responsibility requires a guilty intent and a prohibited act.

In *Durham* v. *United States*, *supra*, Judge Bazelon, the writer of the opinion, criticizes the right-wrong test for reasons which are profoundly impressive, although not all of them are new. He concludes that the said test is not a satisfactory criteria for determining criminal responsibility, and "is based on an entirely obsolete and misleading conception of the nature of insanity." He states that "The science of psychiatry now recognizes that a man is an integrated personality and that reason, which is only one element in that personality, is not the sole determinant of his conduct," adding that "The right-wrong test, which considers knowledge or reason alone, is therefore an inadequate guide to mental responsibility for criminal behavior."

We quote the following from the opinion in that case:

"The rule we now hold must be applied on the retrial of this case

Since the rule for determining mental responsibility is established by statute in Puerto Rico, we are bound to abide by it in the consideration and decision of the question raised by the assignment.

Appellant's contention is in fact that, if in a criminal action the defense relies on the lack of mental capacity as a criminal defense, it is sufficient to justify his acquittal if the evidence shows that, by reason of insanity, he did not know that the act he was about to commit was morally wrong, and that the knowledge or lack of knowledge that the act was contrary to law has no importance. We cannot agree with this theory in view of the provisions of § 39 of the Penal Code, which necessarily lead to the conclusion that mental unsoundness which relieves from punishment, according to our legislation, is that which prevents the accused from knowing the wrongfulness of the act committed by him as an act prohibited by law. This section provides, as has been seen, that "a morbid propensity to commit *prohibited*

---

and in future cases is not unlike that followed by the New Hampshire court since 1870. It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect.

"We use 'disease' in the sense of a condition which is considered capable of either improving or deteriorating. We use 'defect' in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease.

". . . We do not, and indeed could not, formulate an instruction which would be either appropriate or binding in all cases. But under the rule now announced, any instruction should in some way convey to the jury the sense and substance of the following: If . . . the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, . . . may find him guilty. If you . . . believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a

*acts*, existing in the mind of a person who is not shown to have been incapable of knowing *the wrongfulness of such acts*, forms no defense to a prosecution therefor." (Italics ours.) The Code undoubtedly refers to the lack of knowledge of the wrongfulness of the act prohibited by law, contrary thereto. The case invoked by appellant, the decision in *People* v. *Schmidt*, 216 N. Y. 324, 110 N. E. 945, in which the ultimate ruling was that "*there are times and circumstances* in which the word 'wrong,' as used in the statutory test of responsibility [referring to the New York law], *ought not to be limited* to legal wrong," cannot change our view.[11] (Italics ours.)

The writers as well as the courts disagree as to the meaning of the word "wrong" used in relation to the rule for fixing mental responsibility, and it is apparently futile to attempt to reconcile those differences. In any event, we need not attempt it inasmuch as our conclusion as to the meaning of that word is based on our interpretation of § 39

mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act. These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case."

The New Hampshire decisions as well as the decision in the *Durham* case have their advocates and opponents, but they can hardly be overlooked in the event of review of our legislation as respects the test for determining mental responsibility. Regarding the prevailing rule in New Hampshire, see *Mental Disorder as a Criminal Defense* by Weihofen, p. 113, and, as to both, the work by Judge John Biggs, Jr., entitled *The Guilty Mind*. As respects the opinion in the *Durham* case, the article by Judge Simon E. Sobeloff, published in 41 American Bar Association Journal 793, is most interesting.

*Cf. United States* v. *Smith*, 5 U.S.C.M.A. 314.

[11] One of the reasons adduced by those who attack the right and wrong test is that the research and progress in the field of psychiatry show that a mentally unsound person may commit an antisocial act, by reason of insanity, despite his knowledge that it is contrary to law. Yet, it is also likely that he will carry it out knowing that it is moraly wrong. In other words, that the defect noted by the opponents of the rule would not be overcome, at least entirely, by merely extending or limiting to its moral sense the lack of knowledge of the wrongfulness of the act.

*supra.* It is not amiss to add, however, that said interpretation is in accordance with the view expressed in 1952 by the Court of Criminal Appeals (of England). In his work on *Mental Disorder as a Criminal Defense*, Weihofen states at p. 78 that that court held that it had no doubt that " 'wrong' means contrary to law and not 'wrong' according to the opinion of one man or of a number of people on the question whether a particular act might or might not be justified."

For the foregoing reasons, and without examining the other assignments of error, as we find it unnecessary to do so, the judgment rendered in the action for murder is reversed and the case remanded to the lower court for a new trial in accordance with the principles announced in this opinion. Although appellant, as already stated, does not discuss in his brief the appeals in the actions for carrying a prohibited weapon and for violation of the Firearms Registration Act, in view of the fact that we are for the first time laying down the rule which will govern as to the burden of proof where insanity is pleaded as a defense in a criminal case, the judgments entered in those cases, decided on a wrong theory of the law, are also reversed in furtherance of justice and those cases are likewise remanded for a new trial.

---

MR. JUSTICE MARRERO with whom MR. JUSTICE NEGRÓN FERNÁNDEZ joins, concurring.

I concur in the opinion of the Court. I disagree, however, with the reasoning therein for the following reasons:

As indicated in the opinion of the majority, there is a fundamental discrepancy in the jurisprudential view in relation to the rule of burden of proof which should govern those cases in which the defendant relies on the defense of insanity.

The rule—which had its roots in England—prevailing in California as well as in some twenty states of the American Union is that, where the prosecution has proved the facts on which its information is based, it is incumbent on the defendant, if he relies on the defense of insanity, to offer evidence to prove, by a preponderance of the evidence, that defense. *Leland* v. *Oregon*, 343 U.S. 790, 798, 96 L. E. 1302; *People* v. *Willard* (Cal.), 89 Pac. 124; *People* v. *Chamberlain* (Cal.), 60 P. 2d 299; *People* v. *French* (Cal.), 87 P. 2d 1014, 1021; *People* v. *Sloper* (Cal.), 244 Pac. 362; *People* v. *Williams* (Cal.), 194 Pac. 1019; *People* v. *Hickman* (Cal.), 268 Pac. 909; Weihofen, *Mental Disorder as a Criminal Defense*, p. 212. The prosecution may or may not then present evidence in rebuttal (see *People* v. *Chamberlain, supra*), but in either case the trier of facts—the jury or the court—is required to determine whether the defendant has reasonably proved that he was insane at the time of the commission of the act. The trier will then determine, by a preponderance of the evidence,[1] whether such defense has been established.

The rule is based on the fact that the sanity of the accused is not an ingredient of crime. It is a condition precedent of all intelligent action. It is a quality of the actor, not an element of the act. *State* v. *Quigley*, 26 R.I. 263, 58 Atl. 905.[2] It assumes that sanity is the normal state of the human

---

[1] Oregon departs from this rule, it being the only state of the American Union that requires the accused to establish the defense of insanity beyond a reasonable doubt. *Leland* v. *Oregon*, 343 U. S. 790, 798.

[2] In *State* v. *Quigley*, 26 R.I. 263, 58 Atl. 905, it is stated in the course of the opinion:

"... The English rule implies that the question of guilt and the question of insanity raise two distinct issues, and that, while both may be involved in the final verdict, the burden of proof upon each issue lies upon different parties. The most complete and forcible statement of the argument in support of this rule which we have found is contained in the opinion of Judge Danforth in *State* v. *Lawrence*, 57 Me. 574, 581. The American rule, so called, holds that in a criminal case there is but one issue, and that the burden throughout is upon the prosecution to prove not only the criminal

mind and that only a person who commits an act while suffering from mental derangement is excused from criminal responsibility, wherefore it is incumbent on the latter to prove that state and thus show that the ingredients of the crime could not exist in his mind at the time of its commission.

The other rule, the federal rule—*Davis* v. *United States,* 160 U.S. 469, 40 L. Ed. 499—is to the effect that since the prosecution is required to prove the defendant's guilt beyond a reasonable doubt, it is also incumbent on the prosecution to prove the defendant's capacity to commit the crime; and that although the prosecution may, when presenting its case, rely on the presumption of sanity, such presumption is destroyed as soon as the defense presents evidence of insanity, the prosecution then being called upon to comply with

act, but the capacity of the accused to commit it beyond a reasonable doubt.

"We think the first of these positions is the more logical. Sanity is not an ingredient of crime. It is a condition precedent of all intelligent action, as well benevolent as nefarious. It is a quality of the actor, not an element of the act. · It is incumbent upon the prosecution to show the commission of the act, and from this showing and its circumstances to sustain the inferences of malice and such emotions as the particular crime may include. But sanity is not one of these inferences. It is a pre-existing fact which may be taken for granted as implied by law and general experience . . .

"It is argued that criminal intent, malice, and premeditation are facts to be proven by the prosecutor; that these cannot exist in an insane mind; hence sanity must be proved by the prosecutor. But these are facts of mental condition and action, and they can only be proved by inference from material facts, circumstances, and acts. It is incumbent, therefore, upon the prosecution to prove such material facts, circumstances, and acts as would compel the inference of guilt in a sane person, and this is the limit of his burden. In murder the prosecution must establish the act, and, either by inference or additional evidence, malice and premeditation. If these ingredients of the crime cannot exist without sanity, sanity is presumed. All the ingredients of the crime must be proved, and as to these we agree the burden never shifts; but as to sanity it never attaches to the prosecutor. The plea of not guilty by itself does not put the sanity of the accused in issue. He must raise the question otherwise, as all agree, if not by special plea at least by introducing evidence, and this is confession and avoidance."

its duty of presenting evidence of sanity. According to that rule, the trier is then required to determine whether the prosecution has proved the defendant's mental soundness beyond a reasonable doubt. If the prosecution offers no evidence of sanity, it must still determine, taking into account the presumption of sanity as well as the defendant's evidence of insanity, whether he was sane, beyond a reasonable doubt, and if there is a doubt, the trier should give him the benefit of the same. See, also, Wigmore *On Evidence*, Vol. IX, 3d ed., § 2501, p. 359 *et seq.*, and 1955 Supp., pp. 117–118.

I believe that the wisest rule and the one which conforms more to our law is the first one stated. According to that rule, it is incumbent on the defendant to prove the defense of insanity by a preponderance of the evidence. Preponderance of evidence is such evidence as, when weighed with that opposed to it, has more convincing force, and from which it results that the greatest probability of truth lies therein. Caljic, § 801, p. 630; *Cf. Irizarry* v. *Trujillo*, 16 P.R.R. 19.[3] Although it has been held that preponderance of evidence is not a legal phrase and, hence, that the failure of the court to define the same in its instructions to the jury is not prejudicial error—*People* v. *Williams*, *supra;* *Maryland Casualty Co.* v. *Boverie* (Texas), 37 S. W. 2d 310, 312; *Jones* v. *Durham* (Mo.) 67 S. W. 876, 977—my opinion is that this phrase ought to be defined in the instructions to the jury to enable the trier of fact to have an idea, more or less accurate, of the scope and meaning of the same.

Notwithstanding the fact that The People produced no direct evidence to outweigh the testimony of the medical experts offered by the defense tending to show the defendant's insanity, the presumption of sanity mentioned in § 12

---

[3] For additional definitions of the phrase "preponderance of evidence," see 33 Words & Phrases, perm. ed., pp. 389, 392 *et seq.*

of the Penal Code [4] is so strong that, if it is not overcome, it is considered sufficient to show that the defendant was sane at the time of committing the crime. Weihofen, *op. cit.*, p. 214 *et seq.* *Cf.* 16 So. Cal. L. Rev. 245. In Puerto Rico such presumption, like any other presumption, constitutes evidence. It is expressly provided by §§ 96, 102, and 162 of the Law of Evidence (§§ 458, 464, and 524 of the Code of Civil Procedure of Puerto Rico, 1933 ed.), 32 L.P.R.A. §§ 1881, 1887, and 1679—*Cf. Acevedo v. Estate of Caballero*, 9 P.R.R. 382, 387. Sections 96, 102, and 162, *supra*, provide in their pertinent part:

"Sec. 96.—Indirect evidence is of two kinds:

"1. Inferences; and

"2. *Presumptions.*

"Sec. 102.—All other presumptions are satisfactory, if uncontradicted. They are denominated disputable presumptions and may be controverted by other evidence . . .

"Sec. 162. . . . The court or jury is not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction in its mind, against a less number or against a *presumption or other evidence* satisfying its mind." (Italics ours.)

This has also been the holding of the Supreme Court of California in numerous cases in construing §§ 1957, 1963, and 2061 of the Code of Civil Procedure of that state, which are identical with ours *supra*. *People* v. *Chamberlain, supra; Smellie* v. *Southern Pac. Co.*, 299 Pac. 529; *Mar Shee* v. *Maryland Assur. Corp.*, 210 Pac. 269, and cases cited therein.[5]

---

[4] Section 12 of the Penal Code, 33 L.P.R.A. § 33, provides in part that "all persons are of sound mind who are neither idiots, nor lunatics nor affected with insanity."

[5] In *People* v. *Chamberlain*, 60 P. 2d 299, 300, the Supreme Court of California stated as follows:

"No witness testified that the defendant was sane when he committed the crime. The prosecution rested without introducing any testimony to rebut the case of defendant on the issue of sanity. It relied entirely on the presumption of law that all men are presumed

The testimony of the experts on the defendant's mental unsoundness is to be weighed by the jury on the basis of this presumption, such testimony not being binding upon them. *People* v. *Dones,* 56 P.R.R. 201, 211; *People* v. *Willard, supra;* *People* v. *Denningham* (Cal.), 185 P. 2d 614; *People* v. *Gilbert* (Cal.), 240 Pac. 1001; *People* v. *Darling* (Cal.), 237 P. 2d 691. The test adopted in cases of this nature has always been whether the defendant was capable of distinguishing right from wrong at the time of committing the crime. *Leland* v. *Oregon, supra;* *People* v. *Sloper, supra.*[6]

In its exhaustive instructions to the jury the court stated, as has been noted, among other things, that: "The facts alleged by the prosecuting attorney must be proved beyond a reasonable doubt; *those alleged by the defense in this specific case must be proved by a preponderance of the evidence;* . . . The defendant has alleged that, although he did kill the person mentioned in the information and attempted to take the life of another human being, he is not guilty, alleging that he was mentally incapacitated when he committed those acts; in other words, that he is innocent since he was unable to distinguish right from wrong when he committed those acts, and was insane. The law exempts from criminal responsibility the insane, maniacs, lunatics,

---

to be sane, and the evidence, if any, indicating the sanity of defendant, adduced on cross-examination from witnesses called by the defense, including the defendant who testified in his own behalf.

" . . . . . . . .

". . . that a presumption is evidence and may in certain cases outweigh positive evidence adduced against it has long been the settled law of this state."

The case of *Quiñones* v. *Quiñones,* 42 P.R.R. 297, 302, should, in my judgment, be expressly overruled insofar as it may be interpreted as holding otherwise on the question of presumptions.

[6] Appellant also maintains that the trial court "erred in instructing the jury that there must exist a lack of knowledge that an act is wrong in a moral sense . . ." In my opinion, he is not in the right. Moral insanity does not excuse commission of crime. *People* v. *Gilbert, supra.* *People* v. *McCarthy,* 46 Pac. 1073.

and idiots, a mentally diseased person who does not realize what he is doing when committing a criminal act, who is incapable of telling whether such act is right or wrong. The law exempts him from responsibility, and it is therefore the jury's duty to find the defendant not guilty if in its judgment he was in those conditions at the time of committing these acts. In other words, all persons are capable of committing crimes, except idiots, lunatics, or insane persons. The gentlemen of the jury shall determine whether those circumstances have been proved which show that the defendant was insane at the time of perpetrating the crime; that he was insane at the time of committing those acts . . . It is a defense which is used at times, without justification, in cases in which the evidence offered is so complete as to render futile the presentation of any evidence or other sort of defense; but it should not be considered ingenious and deceitful"; and "*it [insanity] is a legitimate defense when it is proved beyond any doubt, by a preponderance of the evidence,* that the defendant was affected by a mental disease which incapacitated him at the time of committing the acts for which he is on trial." (Italics ours.)

After the court gave its instructions, the defense stated: "An exception to each and all of the instructions, especially the instructions which involve the degrees of the crime and the separation of verdicts in relation to the acts charged." At no time did the defense request specific instructions on a particular point or the correction of the instructions already given. This Court has repeatedly held that a general exception to the court's charge does not save any alleged error on appeal, and that it is necessary to take specific exceptions.[7] See *People* v. *Rodríguez*, 70 P.R.R. 21; *People*

---

[7] If the specific exceptions to the instructions had been taken, and if the defendant had given the court an opportunity to make amends, the presumption is that the erroneous instruction last mentioned would have been clarified and corrected. *Cf. Asgill* v. *United States*, 60 F. 2d 776, 780; *United States* v. *Vasilaky*, 168 F. 2d 191.

v. *Piazza*, 60 P.R.R. 561, 570; *People* v. *Mediavilla*, 54 P.R.R. 538; *People* v. *Cardona*, 50 P.R.R. 104, 108; *People* v. *Quirós*, 48 P.R.R. 939, 942; *People* v. *Mercado*, 46 P.R.R. 147, 152; *People* v. *Varela*, 42 P.R.R. 794, and the per curiam opinion rendered in *People* v. *Ayala Martínez* on December 27, 1954, and *People* v. *Vélez*, 77 P.R.R. 775, as well as in *United States* v. *Daily*, 139 F. 2d 7, 9; *Du Vall* v. *United States*, 82 F. 2d 382, 383 (certiorari denied in 298 U. S. 667); *Huffman* v. *State*, 259 S. W. 2d 509, 510; *Garver* v. *State*, 258 S. W. 2d 812, 816; *Commonwealth* v. *Ransom*, 82 A. 2d 547, 551. It has also held time and again that, notwithstanding the fact that the defendant took no specific exceptions to the instructions given to the jury, the Court may notice, on appeal, fundamental errors committed by the trial court when giving the same. *People* v. *Rodríguez, supra; People* v. *Belardo*, 50 P.R.R. 491, 497; *People* v. *Cardona*, 50 P.R.R. 104; *People* v. *Hernández*, 49 P.R.R. 406; *People* v. *Benítez*, 47 P.R.R. 74; *People* v. *Maldonado*, 45 P.R.R. 405; *People* v. *Ramírez de Arellano*, 25 P.R.R. 243.[8] Such action is in accord with the Act of May 30, 1904 (Spec. Sess. Laws, p. 10 (1905)), which is inserted at the end of § 362 of the Code of Criminal Procedure, 1935 ed., § 1 of which reads thus:

"Whenever it appears from the record in any criminal case upon appeal in the Supreme Court, that any requirement of the law has been disregarded by the trial court, the judgment shall not be reversed, unless the error appearing from the record was calculated to injure the rights of either of the parties, and was duly excepted to in the trial court; *Provided, however, That the appellate court may take cognizance of fundamental errors, appearing in the record, although not excepted to,* and render such judgment thereon as the facts and the law may require." (Italics ours.)

The trial court, as has been seen, originally gave an instruction that "the facts alleged by the defense in this

---

[8] See, also, *Fisher* v. *United States*, 328 U. S. 463, 90 L. Ed. 1382, 1386.

specific case must be proved by a preponderance of the evidence." If it had said nothing further on the manner of proving the defense of insanity, there would be no objection to the instruction. However, thereafter the court stated that the defense of insanity "is a legitimate defense when it is proved *beyond any doubt* by a preponderance of the evidence. The addition of the words "beyond any doubt" rendered the instruction altogether wrong, inasmuch as it controverted the concept correctly stated above on preponderance of evidence. 14 Cal. Jur. 2d, p. 255. Since it was the last instruction given on this point, and it being still fresh in the mind of the jurors, it is likely that it led them to believe that the defendant was actually required to prove the defense of insanity "beyond any doubt." Although the defendant merely took general exceptions to the instructions, and although I disagree with the reasoning of the opinion of the Court regarding the manner in which the defense of insanity must be proved, the error thus committed is so fundamental that I agree that the proper action is to reverse the judgments appealed from and to order a new trial.