STATE vs. CHARLES J. QUIGLEY.

PROVIDENCE—MARCH 21, 1904.

PRESENT: Stiness, C. J., Tillinghast and Douglas, JJ.

(1) *Procedure.   Charge to Jury.*

While Gen. Laws cap. 223, § 13, gives the judge presiding at a jury trial great latitude in his comments on the evidence, only requiring that he shall not materially misstate it, it does not impose upon him as a duty anything more than to give instruction in the law; and a refusal to call the attention of the jury to certain portions of the testimony is not ground of exception.

(2) *Criminal Law.   Insanity.*

In a criminal cause, upon the issue of insanity the burden of proof is upon the accused.

Insanity is not a normal condition; but a positive disease and positive proof may reasonably be required to establish it as a fact to be regarded in making up a judgment on any question where it is relevant.

Gen. Laws cap. 82, § 20, requires the defence of insanity to be set up by the accused, and requires the jury to find specially upon it; and having set up this special defence, it is incumbent upon the accused to prove it by evidence; and if the jury, after weighing the evidence for and against the assertion, are not convinced of its truth by a fair preponderance of the evidence, it can not avail him.

INDICTMENT for murder.   Heard on petition of defendant for new trial, and denied.

DOUGLAS, J.   The defendant, on January 30, 1903, was found guilty of the murder of Abraham A. Camac, October 4, 1902.

He now prays for a new trial, alleging:

1.   That the verdict is against the law.

2.   That the verdict is against the evidence.

3.   That the presiding justice erred in excluding certain testimony offered by the defendant.

4.   That the presiding justice erred in his instructions to the jury.

5.   That the presiding justice erred in refusing to instruct the jury as requested by the defendant.

6. That he has discovered new and material evidence which could not, by the exercise of due and reasonable diligence on his part, have been procured for use at the first trial.

The verdict in our judgment is right in law and fact.

The undisputed facts are that the defendant had known one Ellen L. Howard for thirteen or fourteen years, and had become engaged to marry her; that on September 25, 1902, she was married to Abraham A. Camac; that Quigley was informed of this by a letter from Mrs. Howard, Mrs. Camac's mother; that within a day or two after he received this letter he went from Canton, Massachusetts, where he lived, to Pawtucket, as he himself said, to kill the man who had married his girl. He arrived at Pawtucket, Wednesday or Thursday, October first or second, and bought a revolver on Friday, October third. While under the influence of liquor he showed the revolver to the bartender in Rock's saloon; told him that he came from Massachusetts; that he was stopping at Rumford, and that there was a man and woman there whom he was going to shoot. In the evening of Friday, the third, he was discovered in the back yard of Camac's house. The barking of the dog attracted the attention of the people in the house, some of whom went to the door, and, in response to his request to see Abraham Camac, Abraham, with others, went out to see him. Quigley heard Mrs. Camac's voice in the doorway, and reproached her for marrying. Camac told Quigley that he had seen a letter in which Quigley had threatened to blow out his, Camac's, brains if he ever saw him. After some further conversation Quigley said he wished Mr. and Mrs. Camac good luck, and left the place. The next afternoon (Saturday) Quigley went to Rock's saloon, and after he had been there a short time, Camac entered the saloon. At ten minutes past two Quigley went out of the side room in which he was sitting, followed Camac to the bar, and, without the exchange of any words, fired three shots at Camac, wounding him in the left hip and also in the back. Camac died the next morning of these wounds. After the shooting Quigley left the saloon and ran slowly toward the center of the city, and within a short time thereafter he was

arrested. When the officer arrested him he said he was going to give himself up. All the witnesses agreed that Quigley was sober at the time of the shooting. The testimony also showed that Quigley was a man who was accustomed to steady drinking. After his arrest Quigley told officer Flynn, who arrested him, that he was sorry that he did not shoot both Camac and the girl; that he shot Camac because he had married the girl, and that he had bought the revolver a few days before the shooting. Flynn testified that Quigley was sober at the time he arrested him, and that he was calm and cool. Thomas F. Vance, a lawyer, and the coroner of Pawtucket, saw Quigley at half past three that afternoon, and was with him for an hour or more. Mr. Vance testified that Quigley appeared to be all right; that he looked pale, and that he had apparently been drinking a very limited number of glasses of beer.

The same afternoon Quigley was taken to Camac's house and confronted with him. He was very reluctant to go until he was told that the police would protect him. While he was there Camac's father attempted to assault him, and he was thoroughly frightened, and his alarm continued until he was away from the house. Camac, realizing that he was mortally wounded, fully identified Quigley as the person who had shot him.

While on the street between the Camac house and the police station, Quigley's picture was taken by a newspaper man, and he told Mr. Vance that he supposed his picture would be in the Journal and Bulletin, and said something about being the boy murderer. Captain Vananda, of the Pawtucket police, saw Quigley soon after the shooting. He testified that he was very nervous, but that he was quite sober; that he guessed the man had been drinking. At the station Quigley wanted to tell his story to the officer, and told the officer that if he knew the story, the other side of it, that he would not blame him, *i. e.*, Quigley. Chief of Police Rice saw Quigley about 3 P. M., on October 4th, Saturday, and Quigley said to him that he shot Camac because he married the girl he was going with. Rice testified that

Quigley looked pale, but that he could not say that he was under the influence of liquor. He looked like a man who had been on a drunk, but he showed no indications of delirium tremens then; that he remained in the station until Monday morning, and while there showed no indication of delirium tremens to non-professional observers.

None of these facts were controverted.

The accused, through his counsel, sets up the defence of insanity of a temporary character, to wit, delirium tremens; alleging that this incapacity existed at the time of the homicide, but had passed away soon after. There was no pretence that the accused had ever suffered from anything in the nature of permanent aberration of mind.

To support this defence several witnesses appeared who had known the accused from one to twelve years, and their testimony was to the effect that the accused was accustomed to drink to excess, and on some occasions had shown symptoms which to them indicated delirium tremens.

One medical expert, Dr. Ford, made examinations of the accused at various times, at the request of his counsel, and declared it to be his opinion that the accused had delirium tremens or alcoholic insanity on October 4th in an aborted form. He first examined Quigley on Sunday evening, October 5th, and thinks he was then suffering from delusions of persecution. He did not have the typical symptoms of delirium tremens. When asked, "What kind of symptoms did he suffer from?" he answered, "I think they were aborted." He judged from circumstances that the delusions had lasted a week.

In cross-examination it appeared that the doctor thought the accused was suffering from a delusion because the accused told him that he was afraid Mr. Camac might shoot him, and he likewise thought this delusion had lasted a week because Quigley told him so. In describing Quigley's disease, he says: "I think it more on the type of abortive delirium tremens than it was of the typical kind." He says, further: "There was no delirium as far as I could find out. I have no reason to believe that he had active hallucinations and delusions."

The State, in rebuttal, called, amongst other witnesses, Dr. Keene, who is in charge of the State Insane Asylum, who explained that the symptoms of true delirium tremens are visible and apparent to an ordinary, unprofessional observer, consisting of physical tremor and mental hallucinations which the patient can not help giving evidence of.

Omitting all other evidence for the State on that issue, we see no ground upon which the jury could have founded even a reasonable doubt that the homicide was the deliberate, premeditated act of the accused, and that in committing it he possessed and exhibited intelligence and malice. As the jury had heard the evidence which described the attempt of Mr. Camac, the father, to seize a gun for the purpose of shooting Quigley when he was brought to his house to see Camac, the son, as he lay dying, they were quite justified in attributing the fear of Camac, which the accused showed in the presence of the doctor, to a rational appreciation of the situation, and in considering his emotion as the remorse which a sane person would feel after the commission of a heinous crime.

Indeed, it is not now urged by the counsel for the accused that the verdict was against the evidence under the law as charged by the court.

The only exception to the rejection of evidence offered by the accused was taken because the court would not permit him to introduce testimony covering the whole of the defendant's previous life, and also to show the condition of his father, as a foundation for an inference that the defendant had delirium tremens at the time of the homicide. The precise question to which objection was sustained was addressed to a witness who said he had known Quigley about eighteen years, and was: "Now will you kindly tell the jury, in your own way, just what sort of man in Canton Mr. Quigley appeared to be?"

In support of the inquiry defendant's counsel referred to *Shailer v. Bumstead*, 99 Mass. 112, where the court say: "If therefore, the statement or declaration offered has a tendency to prove a condition not in its nature temporary and transient, then . . . . it is admissible. Its weight will depend

upon its significance and proximity." The court, after considerable discussion, said that "evidence that the accused suffered from delirium tremens ten or fifteen years ago, or somebody in his family suffered in that way," was too remote; and again referring to the fact, as shown by authorities submitted. by defendant's counsel, that delirium tremens is a temporary and transient condition, the court said: "You may show what his condition was or anything not too remote; anything say close to this time about his drinking, his habits, and whether he had recently been in the habit of doing it, and then his leaving Canton and coming here, and all that you may show for the purpose of convincing those twelve men there of the mental condition of this man and as to whether or not he did know or didn't know what he was doing at the time he did it, and further than that, of course, I can not see my way at present, but you can save that point if you desire."

"MR. COONEY: Under the circumstances, I desire to save that point if you will permit. Exception noted by Mr. Cooney."

It would be sufficient to say of this exception in a civil case that it could not be entertained, because it does not apply to any specific testimony or raise any specific question of law; and in this case, if we consider the question which was attempted to be raised, we can not sustain the exception. The court in effect told the counsel that he must keep within reasonable limits in proving past conditions as a basis of inference with regard to the present. The evidence which was afterwards offered on this point and admitted was all that could have been reasonably considered as bearing even remotely upon the question. Witnesses were allowed to testify to Quigley's condition and habits for periods of from one to twelve years, and his father's habits were detailed also without objection. This exception is untenable.

The objection to the charge and the exceptions taken to the refusal of the court to charge as requested by counsel for the accused raise two questions.

(1) The fifth, sixth, and seventh requests were that the presiding justice should call the attention of the jury particularly to

certain portions of the testimony, and should suggest to them certain inferences of fact to be drawn from them.

While our statute, Gen. Laws cap. 223, § 13, gives the judge who is presiding at a jury trial great latitude in his comments on the evidence, only requiring that he shall not materially misstate it, it does not impose upon him as a duty anything more than to give instruction in the law. It must be left to the discretion of the judge in every case to discuss the evidence and analyze it as bearing upon the issues of fact which the jury are to determine or to confine himself only to a statement of the legal propositions which are applicable to those issues, leaving the jury to find the facts and apply these principles for themselves. Some cases require one mode of treatment, and others the other. But it can never be insisted by a party that a certain class of facts or evidence should be singled out by the judge for particular comment, as was here requested, and the court very properly refused to do as it was asked.

The jury had already been told by the judge that they were to consider and weigh all the evidence in the case, and that was all that the accused or the State was entitled to demand.

The second request, so far as it involved a question of law, had already been charged.

The other question is of greater importance and requires very careful consideration.

(2) The court charged that upon the issue of insanity the burden of proof is upon the accused, and that the rule of evidence upon this issue is that it shall be proven by a fair preponderance of evidence.

The first, third, and fourth requests, which were refused, were based upon the proposition that upon the question of sanity or insanity of the accused the burden is upon the State to prove sanity beyond a reasonable doubt.

The question was settled in England in 1843 by the answer of the judges to questions propounded by the House of Lords, suggested by the case of *Daniel M'Naghten*, reported in 10 Cl. & Fin. 200. In that case the law was said to be: That if the accused was conscious that the act was one which he ought not to do; and if the act was at the same time contrary to law, he

is punishable.   In all cases of this kind the jurors ought to be told that every man is presumed to be sane and to possess a sufficient degree of reason to be responsible for his crime until the contrary be proved to their satisfaction;   and that to establish a defence on the ground of insanity, it must be clearly proved that at the time of committing the act the party was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing or as not to know that what he was doing was wrong.

We are not now concerned with the definition of insanity here given, which has been criticised as not entirely accurate. In the case at bar the rule of evidence only is at issue.

The question has arisen in almost every State of the Union, and in the courts of the United States, and between the decisions of these courts there is a hopeless conflict. '

The decisions up to 1882 were collected in an article by Henry Wade Rogers in the Central Law Journal, vol. 14, p. 2. The writer cites, as supporting the view that the burden is upon the accused, the courts of Alabama, Arkansas, California, Connecticut, Delaware, Georgia, Iowa, Kentucky, Maine, Massachusetts, Minnesota, Missouri, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, and Virginia. To the contrary are cited Illinois, Indiana, Kansas, Michigan, Mississippi, and New Hampshire, while New York is called uncertain.

From the report of the trial of Henry K. Goodwin, published in 1887 by the attorney-general of Massachusetts, by authority of law, it appears that the courts of that State have abandoned the English rule.   Judge Allen, who presided, distinctly charged the jury that if upon the whole evidence they had a reasonable doubt of the defendant's sanity, they should acquit him.

Georgia has also changed its view, *Ryder* v. *State,* 100 Ga. 528; Maryland, *Spencer* v. *State,* 69 Md. 28, and New Mexico *Faulkner* v. *Ter.,* 6 N. M. 465, where the question has come up for the first time, have adopted the same rule.   To the supporters of the English rule named above may be added Nevada, *State* v. *Lewis,* 20 Nev. 333; South Dakota, *State* v. *Yokum,* 11 So. Da. 544; and Utah, *People* v. *Dillon,* 8 U. 92.

The case of *State v. Scott* (La.), 36 L. R. A. 721, sc. 49 La. Ann. 253, 1897, reviews the law up to that date and adopts the English rule. .The notes to this case present fully all the American cases to that time, and justify the conclusion of the court that the great weight of authority, including both decisions of courts and conclusions. of the text-writers, supports its decision.

Perhaps the most weighty authority to the contrary is *Davis v. United States*, 160 U. S. 469, which adopts the view apparently originated by Mr. Bishop, 2 Bishop Cr. Proc. § 673, where it is thus stated: "To the writer of these volumes the true doctrine seems to be the following: 'Sanity' as observed by a learned judge (Wright J. in *Walter v. People*, 32 N. Y. 147, 164), 'is presumed to be the normal state of the human mind, and it is never incumbent upon the prosecutor to give affirmative evidence that such state exists in a particular case.' .But suppose this normal state is .denied to have existed in the particular instance; then, if evidence is produced in support of such denial, the jury must judge of it and its effect on the main issue of guilty or not guilty; and if, considering all the evidence, and considering the presumption that what a man does is sanely done, and suffering the evidence and the presumption to work together in their minds, they entertain a reasonable doubt whether the prisoner did the act in a sane state of mind, they are to acquit."

In *Davis v. The United States*, the court hold that the burden is upon the prosecution to establish sanity as an ingredient of the crime; and hence, when the presumption of sanity becomes silent on the introduction of evidence against it, proof of sanity beyond a reasonable doubt must be made .before the jury can convict.

It would .be a fruitless task to review in detail the cases where the question has been considered, for they are divided into two classes which follow substantially the same two divergent lines of reasoning.

The English rule implies that the question of guilt and the question of insanity raise two distinct issues, and that while both may be involved in the final verdict, the burden of proof

upon each issue lies upon different parties. The most complete and forcible statement of the argument in support of this rule which we have found is contained in the opinion of Judge Danforth in *State* v. *Lawrence,* 57 Me. 574; 581.

The American rule, so-called, holds that in a criminal case there is but one issue and that the burden throughout is upon the prosecution to prove, not only the criminal act, but the capacity of the accused to commit it beyond a reasonable doubt.

We think the first of these positions is the more logical. Sanity is not an ingredient of crime. It is a condition precedent of all intelligent action, as well benevolent as nefarious. It is a quality of the actor, not an element of the act. It is incumbent upon the prosecution to show the commission of the act, and from this showing and its circumstances to sustain the inferences of malice and such emotions as the particular crime may include. But sanity is not one of these inferences. It is a pre-existing fact which may be taken for granted as implied by law and general experience. We do not infer sanity from the criminal act as we do malice and premeditation. Sanity is a premise, not a conclusion.

It is argued that criminal intent, malice, and premeditation are facts to be proven by the prosecutor; that these can not exist in an insane mind; hence sanity must be proved by the prosecutor. But these are facts of mental condition and action, and they can only be proved by inference from material facts, circumstances, and acts. It is incumbent, therefore, upon the prosecution to prove such material facts, circumstances, and acts as would compel the inference of guilt in a sane person, and this is the limit of his burden.

In murder the prosecution must establish the act, and either by inference or additional evidence, malice, and premeditation. If these ingredients of the crime can not exist without sanity, sanity is presumed. All the ingredients of the crime must be proved, and as to these we agree the burden never shifts; but as to sanity it never attaches to the prosecutor. The plea of not guilty by itself does not put the sanity of the accused in issue. He must raise the question otherwise, as all agree, if not by special plea at least by introducing evi-

dence, and this is confession and avoidance. Confession and avoidance are an admission that the accused performed the act charged and a denial that the act was criminal. They are not, as the arguments of several courts assume, an admission that a crime was committed and the tender of an excuse for committing it.

The defence of insanity admits the act but not the crime, just as the pleas of self-defence or of a license do. Upon both these defences we have held the burden to be upon the accused. *State* v. *Ballou*, 20 R. I. 607; *State* v. *Beswick*, 13 R. I. 211.

The defendant's counsel argue that because when a defendant relies upon an alibi this defence is established by sufficient evidence to create a reasonable doubt of his presence at the crime, therefore it should be held that when the defence of insanity is set up it will be sustained by sufficient evidence to create a reasonable doubt of the sanity of the defendant. This argument is specious. It is part of the State's case to show that the accused was present and did the act complained of. An alibi is merely a circumstantial denial of the State's case. The issue is not a new one, and the burden of proof and the rule for weighing evidence remain the same. But physical presence being proved, mental presence is inferred without proof. Setting up a mental alibi introduces a new issue— one not ordinarily involved in the issue of guilty or not guilty; an issue not concerning the crime as a crime, but the accused as an actor. Presence or absence of body at a given place at a given time is a physical fact always depending upon evidence. Sanity of a human being is an assumed fact, never depending upon evidence until it is disputed.

Another error which it seems to us is committed by those who adopt the American rule is in mistaking the scope of presumptions of law. There are two well-settled presumptions involved in this question, both disputable.

First. That every man is presumed to be innocent of crime. This presumption vanishes when the mind is convinced by evidence that the accused did commit the crime.

Second. Every man is supposed to be a responsible, free

agent, capable from knowing right from wrong and able to choose between them.

This presumption vanishes when the mind is convinced that the accused was insane at the time under consideration. Now the theory we are considering supposes these two presumptions to be summoned as witnesses and to be weighed against each other, and it said by some of these cases that the presumption of innocence outweighs the presumption of sanity. A moment's reflection will show that the contrary is the case; for, as there are many more persons who commit crime than there are who are criminally irresponsible, when a given person commits a criminal act, in the absence of further knowledge, we consider him guilty, not insane. Laws. Presumptive Ev. 458. But properly speaking, presumptions no not clash together. They are assumptions of the truth of certain facts in the absence of evidence. The normal office of a disputable presumption of law is to fix the burden of proof, not to modify the acceptance of evidence when resort is had to evidence. "When conflicting evidence on the point covered by the presumption of law is actually gone into, the presumption of law is *functus officio* as a presumption of law." Best. Ev. 276, *n.* 2.

The burden of proof on any issue is always contrary to the presumption. One who disputes the presumption must take the burden. "If to procure an acquittal he relies upon insanity, he assumes the burden of proof as to that matter; he makes insanity an affirmative issue upon his part, because it is an allegation of fact in opposition to a presumption of law." *People* v. *Walter*, 1 Ida. 386, 391. He invites a resort to evidence, and must supply the evidence. This is involved in Mr. Wharton's statement:

"Hence it may be stated as a test admitting of universal application that whether the proposition be affirmative or negative the party against whom judgment would be given as to a particular issue, supposing no proof to be offered on either side, has on him, whether he be plaintiff or defendant, the burden of proof which he must satisfactorily sustain." Whar. Ev. § 357.

In civil cases this is the only function of a disputable presumption of law.

In criminal cases the presumption of innocence goes further and imposes a rule for weighing evidence, and it extends its protection to the accused until this rule of evidence is satisfied. In this capacity it does not assume the place of a witness, but rather that of an advocate; it does not contradict the evidence, but insists that it shall be weighed by the prescribed standard. When the evidence works conviction beyond a reasonable doubt the presumption of innocence withdraws its protection.

Coupled with the presumption of sanity there is no such arbitrary rule of weighing evidence.

It was held by some early cases in this country that this defence must be proved by the accused beyond a reasonable doubt; but the very general concurrence of those courts which hold the accused to proof of the fact only requires that the evidence should be sufficient to satisfy, or that it should preponderate in his favor. The more stringent rule upon the main issue was adopted out of favor to the accused, and it would seem inconsistent, while deeming him worthy of favor on one issue, to impose a greater burden than simple proof upon him on the other.

We may condense these views as follows:

Homicide unexplained is murder at common law. *Com.* v. *York,* 1 Ben. & H. L. C. 322; *Com.* v. *Webster,* 5 Cush. 320; Whar. Cr. Ev. § 738. The definition of murder includes several elements, all of which, except the act of killing, are inferable from the act itself.

The presumption of innocence is a presumption that the accused did not commit the act which the law calls a crime. Evidence convincing beyond a reasonable doubt that he did commit the act is proof that he committed the crime. The presumption of innocence has been overcome when the criminal act is proven.

Involved in this conclusion, amongst other things, is the presumption, which is an inference of fact from general experience, that the accused was sane when he committed the

criminal act. This presumption continues after the presumption of innocence has been overcome. Evidence is required to overcome it, and the accused must furnish this evidence. If the evidence on this point simply balances, and so produces no probative effect on the mind, the presumption of sanity survives and the judgment that the man is guilty remains unshaken.

Sanity is a condition which does not require proof until its existence is denied. When the well-established but absolutely arbitrary rule is announced that all facts constituting the crime must be proved beyond a reasonable doubt, it can not logically be held to include a fact which is not required to be proved at all.

Insanity is not a normal condition, but a positive disease; and positive proof may reasonably be required to establish it as a fact to be regarded in making up a judgment on any question where it is relevant.

We can not doubt that this is the view of the issue which is implied by our statute law, Gen. Laws cap. 82, § 22, which provides: "Whenever, upon the trial of any person upon an indictment, the accused shall set up in defence thereto his insanity, the jury, if they acquit such person upon such ground, shall state that they have so acquitted him," etc.

This statute requires the defence of insanity to be set up by the accused, and requires the jury to find specially upon that issue. Under this provision the rules of evidence are as essentially fixed as if a special plea of insanity were required. The statute is silent as to how this defence shall be set up, and so it need not be presented in writing but may be advanced verbally by counsel as the plea of not guilty is by the accused, or by the court on his behalf, if he stands mute, when arraigned. Having set up this special defence, it is incumbent upon him to prove it by evidence; and if the jury, after weighing the evidence for and against the assertion, are not convinced of its truth by a fair preponderance of the evidence, it can not avail him. The statute does not contemplate that the jury shall acquit on the ground that they doubt the sanity of the accused, but on the ground of his actual insanity. And the finding of

the jury is made sufficient ground for the court in its discretion, and without further investigation, to certify the case to the governor that the insane person may be confined.

Statutes of similar tenor have received this construction in Massachusetts, *Com.* v. *Eddy*, 7 Gray, 583; in Minnesota, *Bonfanti* v. *The State*, 2 Minn. 123; in Louisiana, *State* v. *Scott*, 36 L. R. A. 721, 740; in Pennsylvania, *Ortwein* v. *Com.*, 76 Pa. St. 414; in Maine, *State* v. *Lawrence, supra.*

It has been held within the power of the General Assembly under the constitution, to provide that the burden of proving an excuse or license to do an act which is generally criminal shall be upon the accused. *State* v. *Beswick*, 13 R. I. 211, approved in *State* v. *Higgins, ib.* 330, and *State* v. *Mellor, ib.* 666.

These decisions are as applicable to the defence of insanity as to the defence of license.

In Oregon the English rule is enacted by statute. 1 Bel. & Cot. Ann. Code, §. 1393.

The last ground urged for granting a new trial is based upon the contention that one of the medical witnesses called by the State in rebuttal, was mistaken in saying that he observed the condition of the accused on the 7th day of October. The witness testifies that he vaccinated the accused and several others on that day, and during the operation, which occupied a very short time, took notice of his condition. The substance of his testimony is that the witness did not note any abnormal symptoms in the accused. Counsel now ask to have a new trial, that they may present evidence that the accused was not vaccinated on the 7th day of October. One of the affidavits to support this prayer divulges the fact that immediately after this testimony was given a recess was taken, during which counsel and his expert medical witness examined both arms of the accused and found no trace of a recent vaccination. Not only the accused, therefore, who was perfectly sane when he was tried, but his counsel, knew the alleged fact in time to have shown the arm to the jury and in view of it to have cross-examined the witness. By bringing the matter to the attention of the court he could have procured the record of medical

treatment of the accused at the jail, which he has since obtained. We fail to see any merit in this allegation.

In view of the overwhelming preponderance of the whole evidence that the accused was guilty of willful murder, we can not assign to the error, if it was one, any appreciable influence on the minds of the jury.

The petition for new trial is denied, and the case will be remanded to the Common Pleas Division for sentence.

*Charles F. Stearns, Attorney-General,* for State.
*Cooney and Cahill,* for defendant.