**STATE**

v.

**Esteban CARPIO.**

No. 2009–28–C.A.

Supreme Court of Rhode Island.

March 14, 2012.

Jane M. McSoley, Department of Attorney General, for State.

Catherine Gibran, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, ROBINSON,
and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

On April 16, 2005, horror descended upon the Providence Police Department when a male suspect, in custody because he was suspected of stabbing an eighty-four-year-old woman, disarmed a veteran police detective and then shot and killed him with his own service weapon.

The defendant, Esteban Carpio (defendant or Carpio), is before the Supreme Court on appeal from a judgment of conviction for the first-degree murder of a police officer; discharging a firearm while committing a crime of violence; and felony assault with a dangerous weapon. The defendant was sentenced to life imprisonment without the possibility of parole, a consecutive sentence of life imprisonment for committing a crime of violence with a firearm resulting in death, and another consecutive twenty-year term for felony assault on an elderly woman. On appeal to this Court, the defendant contends that, based on his mental incapacity, he could not be found guilty of the crimes set forth in the indictment, and that the trial justice improperly instructed the jury on the question of criminal responsibility. The defendant also argues that the sentence of life imprisonment without the possibility of parole was error. We deny and dismiss this appeal and affirm the judgment of the Superior Court in all respects.

## Facts and Travel

The tumultuous and tragic events at the heart of this case began to unfold in the early afternoon of April 16, 2005, when Carpio, driving a red van, attempted to rob eighty-four-year-old Madeline Gatta (Mrs. Gatta), as she was standing in front of her home on Swift Street in Providence. The defendant, dressed in black, with his face concealed by a scarf and hat, approached Mrs. Gatta, who immediately began crying out for help; she felt a forceful blow to her upper back, causing her to collapse to the ground.[1] The defendant then undertook the first of three escapes that day—he took off on foot, in the opposite direction from Mrs. Gatta, and then fled in the red van. An alert neighbor was able to obtain the vehicle's registration number before defendant made his escape.

Earlier that same afternoon, Carpio's girlfriend, Samein Phin (Phin), had an appointment for a job interview with an escort service; the interview was to take place at a nearby restaurant. Carpio drove Phin to the designated restaurant in the red van; defendant accompanied Phin into the restaurant, but left shortly thereafter. According to Phin, she was at the interview for about an hour and was unaware of Carpio's whereabouts or activities during that time. Around 2 p.m., defendant called Phin's cell phone to inquire if someone else could drive her home. Phin flatly refused to try to find someone else to drive her, and she directed Carpio to "[c]ome pick me up." Carpio returned to the restaurant in the red van, but immediately announced, "I want to go home and get the other car." The two returned to Phin's apartment where they swapped the van for another vehicle and proceeded to the Providence Place Mall.

Meanwhile, a police search for the suspect involved in the assault against Mrs. Gatta continued throughout the afternoon.

---

1. Mrs. Gatta testified that she mistakenly believed defendant punched her in the back, but later learned he had stabbed her in the back, near the strap of her purse. She remained in the hospital for two days because the wound could not be closed due to threat of infection.

Aided by the van's license plate number, the investigating officers eventually were able to locate Carpio. The vehicle was registered to a rental agency, and was leased by Phin; Carpio was an authorized driver. The police also learned that defendant had a revoked Massachusetts driver's license and a suspended Rhode Island driver's license. Later that day, when police arrived at Phin's apartment, she initially denied that Carpio was home; however, defendant was apprehended without incident at the apartment.

In confronting Carpio, the officers identified themselves and informed him that they needed to speak with him; they requested that he accompany them to the police station. Phin told Carpio that the Providence Police detectives were there to help him. Although Carpio did not respond to the officers' request to go to the station, he offered no overt resistance when handcuffed. While accompanying defendant to the police cruiser, Detective Charles Boranian (Det. Boranian) felt Carpio begin to pull to his left as if he was preparing to escape; however, he was placed in the rear of the cruiser without resistance. The police officer driving the cruiser described Carpio as calm, the ride to the station as uneventful, and he noted that Carpio did not appear to be under the influence of any drugs or alcohol.

At police headquarters, the arresting detectives escorted Carpio to a conference room; they removed the handcuffs and permitted him to "take a seat wherever he wanted" in the conference room, so that he would be comfortable and feel free to speak with the officers. Tragically, in light of the ensuing events, defendant chose a seat that was in line with the open door. While waiting for the lead investigator—Detective James Allen (Det. Allen)—to arrive, the other detectives engaged Carpio in small talk in an effort to put him at ease. The defendant responded by repeating the officers' questions before giving an answer, if he answered at all. Carpio told the detectives that his name was Boselino Carr, that he worked as a barber, lived in Boston, and that he had never been arrested. The record reflects that the majority of this was untrue.[2]

When Det. Allen entered the conference room, he positioned himself across from Carpio, with his back to the door. Detective Allen's firearm, a department-issued .40-caliber Beretta semi-automatic pistol, plainly was visible in a holster on his belt. At various times during Det. Allen's interview, several detectives entered and left the conference room as the questioning continued. The record discloses that Detective Timothy McGann (Det. McGann) and Detective Emilio Matos (Det. Matos) were present during the beginning of the interview.

Detective Allen began the interview by asking Carpio background questions, similar to those questions posed earlier by the other detectives, but in greater detail. Carpio persisted in repeating the question before giving an answer. According to the detectives, as the interview progressed, Carpio increasingly became rude and disrespectful. The defendant told Det. Allen that he worked as a barber in Massachusetts and that he had a girlfriend and daughter in Rhode Island. When Carpio stated that his name was Boselino Carr and that he had never been arrested, Det. Allen informed him that "we know who you are, and you are in some serious trou-

---

**2.** The record in this case reveals that defendant had an extensive criminal record, including numerous arrests for drugs, assault, and weapons, although most of Carpio's arrests did not result in convictions.

ble." At this point, defendant became agitated and began fidgeting in his chair.

Detectives Allen and McGann were alone in the conference room when Carpio asked for a glass of water; Det. McGann left the room to retrieve a glass of water, leaving Carpio alone with Det. Allen. When Det. McGann returned, there was shouting and the sounds of a violent struggle in the conference room, and he was shocked to discover that the conference room door was closed and locked from the inside.

The record discloses that as Det. McGann frantically tried to break down the door, the shouting continued, followed by gunshots and then silence. His calls to Det. Allen received no response, at which point Det. McGann drew his firearm and backed away from the door, expecting Carpio to exit the conference room to attempt an escape. However, as more officers converged on the area, Det. McGann heard several more gunshots. All efforts to communicate with Det. Allen were met with silence. Eventually, after three attempts to breach the door with a battering ram, the officers gained access to the conference room. Detective Allen lay mortally wounded on the conference room floor and Carpio was gone.[3] Detective Allen was transported to Rhode Island Hospital by rescue, where he was pronounced dead at 12:29 a.m. on Sunday, April 17, 2005. Detective Allen was fifty years old; he was survived by a wife and two daughters. Detective Allen honorably served the people of Providence for twenty-seven years.

The conference room was in disarray and Carpio was missing. It was not until the officers entered an adjoining office with its window shot out that they realized that Carpio had escaped. The murder weapon, later determined to be Det. Allen's firearm, was discovered on the metal grate below the office with the shattered window. An extensive manhunt was undertaken by the Providence Police, members of the Rhode Island State Police, and the F.B.I. The search was aided by an alert passerby and a vigilant taxi driver. The passerby testified that she and her boyfriend were driving past the Providence Public Safety Complex around midnight on the night of the murder, when she heard the sound of shattering glass and saw glass fragments flying. The witness testified that she saw a man standing in a window several stories above the ground; he pushed the glass out of the window frame and climbed onto the ledge, hanging by his hands before dropping to the ground below. Despite the long fall, the man sprang to his feet and quickly walked down the street. The witness noted that the man was dressed in dark clothing, and was possibly wearing jeans and a black bomber jacket or a hoodie. After striding down the highway overpass, the man jumped over a fence and disappeared from sight.

The defendant, having made his second escape of the day, appeared unannounced at the apartment of a friend, Harmony Boise (Boise), in downtown Providence. Boise noticed that defendant was bleeding from his hands and that he was extremely agitated, continuously looking out the window and chanting, "Niggers ain't shit ... Bitches ain't shit." The defendant refused to tell Boise what had happened, and after roughly fifteen to twenty minutes, Carpio asked her to call a taxi to take him to New York City. Boise complied.

The taxi driver dispatched to the call was informed that a woman had called on behalf of a man requesting a ride to New

---

**3.** The EMT who first responded testified that Det. Allen was bleeding profusely from two gunshot wounds, one to his head and one to his clavicle.

York City or Boston and that the man had $500 in cash for the fare. The dispatcher also alerted the driver about a police radio report that an officer had been shot; the dispatcher warned the driver to use caution when picking up the fare. As the taxi driver neared the vicinity of police headquarters, he noticed the police roadblocks and felt that "something just didn't seem right" about the call; he decided to inform the police. The driver approached a police officer and advised him that the fare he was about to pick up could be the man the police were hunting. After instructing him to lock his doors, the officers followed the taxi driver to the pickup location. As the cab pulled up and Carpio approached the vehicle, he stared at the driver for a few seconds, and—for the third and final time—turned and ran away. Several officers chased Carpio, brought him down, and attempted to subdue him. A violent struggle ensued.[4] Despite the disproportionate number of officers and their repeated commands to Carpio to cease resisting, defendant kicked and flailed, resisting arrest and attempting to flee. Eventually, the officers were able to handcuff Carpio and secure him in the police cruiser.[5]

In interviews conducted at the hospital and later at police headquarters, Carpio professed no recollection of the events leading up to his apprehension; he claimed that a friend of his made him crazy, that he heard voices, and he blamed the devil for his troubles. When asked why he locked the conference room door, Carpio stated, "I feel like I had to do it." The defendant also admitted that he grabbed the gun after a struggle because he believed that the man with the gun wanted to kill him. He later recalled fighting with an officer who punched and kicked him, and he remembered jumping out the window. Carpio also acknowledged taking Det. Allen's weapon, and he said that he "had to pull the trigger or something," but later denied doing so. The defense was insanity.

In preparation for trial, Carpio was examined by several mental health experts. The defense retained psychiatrist, Steve Heisel, M.D. (Dr. Heisel) and forensic neuropsychologist, Paul Spiers, Ph.D. (Dr. Spiers) as expert witnesses to support the defense theory that defendant was not criminally responsible for his conduct because he suffered from a mental impairment or defect. Doctor Heisel testified that at the time he stabbed Mrs. Gatta and killed Det. Allen, Carpio suffered from schizophrenia-form psychosis and lacked the substantial capacity to conform his conduct to that which is required by law. Likewise, Dr. Spiers testified that it was his opinion that Carpio suffered an acute onset of paranoid psychosis that prevented him from conforming his conduct to the requirements of the law.

The state also presented two expert witnesses: neuropsychologist and professor, David Faust, Ph.D. (Dr. Faust); and forensic psychiatrist and professor of psychiatry, Martin Kelly, M.D. (Dr. Kelly). Both

4. Rhode Island State Police Officer Christopher Zarrella (Trooper Zarrella) testified that he and Providence Police Officer Petrocchi tackled Carpio to the ground and that he, Zarrella, "struck [Carpio] in a closed fist in and about the face and head" three times because Carpio was violently kicking and punching the officers. Trooper Zarrella also testified that, at the time, he believed that Carpio was the suspect who had shot a police

officer and was armed and dangerous. These officers were assisted by the F.B.I. and other Providence Police officers.

5. Carpio was transported to Rhode Island Hospital for injuries sustained at various points during his attack on Det. Allen, his several-story jump from the police station, and the violent struggle during his arrest.

witnesses testified that Carpio was not impaired. Doctor Faust testified that he examined the results of the psychological tests administered to defendant while he awaited trial at the Adult Correctional Institutions (ACI); he concluded that the administration of the test and subsequent results were questionable and that Carpio's answers exhibited "gross malingering."[6] Doctor Kelly testified that when Carpio committed the crimes, he was not suffering from a mental disease or defect that would have prevented him from appreciating the wrongfulness of his conduct or from conforming his conduct to that required by law.

At the close of the evidence, the trial justice instructed the jury on the law as it pertained to the defense of insanity. The trial justice explained that "[a] person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law [was] so substantially impaired that he cannot justly be held responsible." He also impressed upon the jury that the question of whether defendant is criminally responsible is a question for the fact finder—the jury—to determine in light of community standards of blameworthiness. The trial justice informed the jury that it should consider the totality of the circumstances to determine whether defendant suffered from a mental disability, whether such a disability impaired his capacity to appreciate the wrongfulness of his conduct, and whether

there was a sufficient relationship between that mental disability and the criminal conduct such that he could not justly be held responsible for his actions.

Implicit in the jury's finding of guilt was the determination that Carpio did not suffer mental impairment sufficient to negate his criminal responsibility at the time the crimes were committed. The jury found him guilty beyond a reasonable doubt of all counts in the indictment, including the murder of a police officer in the performance of his duties—an offense that qualifies for a sentence of life imprisonment without parole. At the sentencing hearing, and after a thoughtful and meticulous review of the voluminous record and sentencing material, the trial justice concluded that Carpio was "incorrigible;" he added that when "the murder of a police officer is committed by an individual with a history of assaultive misconduct, who abuses drugs, and who has just stabbed a gentle, frail, elderly lady in the back, life in prison is a fitting sentence." The trial justice imposed the harshest sentence under the law: life imprisonment without parole for the first-degree murder of a police officer; a consecutive term of life imprisonment for the discharge of a firearm while committing a crime of violence; and a consecutive term of twenty years to serve on the felony assault of Mrs. Gatta with a dangerous weapon.

Significantly, defendant did not move for a judgment of acquittal in accordance with Rule 29 of the Superior Court Rules of Criminal Procedure, nor did he pursue a motion for a new trial.[7] On appeal to this

---

6. Doctor Faust testified that he gave significantly less credence to the results of the Minnesota Multiphasic Personality Inventory (M.M.P.I.) test that Dr. Spiers had Carpio take because the test was administered improperly and "shows exaggeration." Doctor Faust also stated that "[i]f you find problems and faults in the testing, one has doubt about

the rest of it" and that there were numerous errors with the testing process, such that he did not consider it reliable.

7. At 9:12 p.m. on July 5, 2006, the date assigned for hearing any new-trial motion that might be filed, defense counsel sent the trial justice an e-mail, which stated: "I apologize

Court, defendant contends that the trial justice should have found that the evidence was insufficient to establish his criminal responsibility, and that he erred in his instructions to the jury on the question of criminal responsibility. The defendant also contends that the sentence of life imprisonment without the possibility of parole was not warranted, and he asks the Court to reduce the sentence to life imprisonment.

## I

### Insufficiency of the Evidence

The defendant asks this Court to overlook our well-settled raise-or-waive rule in order to permit review of his appellate contention that the evidence presented at trial was insufficient to sustain his conviction. The defendant concedes that "the pivotal question in this case—the rejection of the insanity defense—was not properly positioned for appellate review." Nonetheless, Carpio requests that this Court review the alleged insufficiency of the evidence *de novo* because, he alleges, there remains a question of criminal responsibility and there is no other avenue for direct review. We decline to do so.

■ It is this Court's deep-rooted practice that "a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *State v. Bido*, 941 A.2d 822, 829 (R.I.2008). "According to our well-settled 'raise or waive' rule, issues that were not preserved by a specific objection at trial, 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.'" *State v. Pacheco*, 763 A.2d 971, 976 (R.I.2001) (quoting *State v. Bettencourt*,

723 A.2d 1101, 1107 (R.I.1999)). We also have stated that "[n]ot only does the rule serve judicial economy by encouraging resolution of issues at the trial level, it also promotes fairer and more efficient trial proceedings by providing opposing counsel with an opportunity to respond appropriately to claims raised." *State v. Burke*, 522 A.2d 725, 731 (R.I.1987). Although, on occasion, we have "recognized a narrow exception to the raise or waive rule," *State v. Bouffard*, 945 A.2d 305, 311 (R.I.2008), to qualify for this relief "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *Id.* at 312 (quoting *State v. Breen*, 767 A.2d 50, 57 (R.I.2001)).

■ This Court has held that a "challenge to the sufficiency of the evidence is properly framed in terms of a challenge to the trial justice's denial of the defendant's motions for judgment of acquittal and new trial." *State v. Lynch*, 854 A.2d 1022, 1045–46 (R.I.2004) (quoting *State v. Mercado*, 635 A.2d 260, 262 (R.I.1993)); *see State v. Clark*, 974 A.2d 558, 570 (R.I.2009) (noting that a criminal defendant may move for a new trial under Rule 33 of the Superior Court Rules of Criminal Procedure to challenge the sufficiency of the evidence). In this case, Carpio concedes that the question of the sufficiency of the evidence on the issue of his criminal responsibility properly is not before this Court because defendant not only failed to move for a judgment of acquittal, he explicitly elected not to file a motion for a new trial. *See State v. Tower*, 984 A.2d 40, 45 (R.I.2009) (holding the defendant did not properly preserve issue of the suffi-

for not writing sooner. I do not intend to file a motion for new trial at this time. I guess a

sentencing date is in order."

ciency of the evidence because he failed to renew a motion for judgment of acquittal at the close of evidence). Because we remain steadfast in our adherence to the raise-or-waive rule, we decline to review Carpio's contention that the evidence was insufficient to establish his criminal responsibility.

The defendant argues that, despite these procedural defaults, he has a statutory right to appellate review, which he never has waived. Carpio, however, has not set forth the source from which this "statutory right" springs, nor does he cite to any statutory support for his contention that issues not preserved for appellate review must be decided. The defendant refers us to United States Supreme Court cases and to a multitude of cases from other jurisdictions that resort to the plain error rule to permit review of errors not previously raised or properly preserved. Yet, he also acknowledges that this Court does not recognize the plain error doctrine. *See State v. Hallenbeck*, 878 A.2d 992, 1018 (R.I. 2005). In sum, Carpio has attempted to cobble together a paradigm under which this Court may review his claim concerning the sufficiency of the trial evidence based on statutory rights or plain error. We reject these arguments.

It is undisputed that defense counsel unequivocally declined to move for a new trial; he communicated to the trial justice that "I do not intend to file a motion for [a] new trial at this time." Carpio therefore, made a conscious, and indeed strategic, decision to forgo the opportunity to move for a new trial and challenge the sufficiency of the evidence. We are satisfied that Carpio has no avenue on direct appeal to challenge the sufficiency of the trial evidence because that issue was waived.

▆ Lastly, as defendant concedes, Rhode Island does not recognize the doctrine of plain error, nor are we inclined to

adopt such a rule in this case. *See Hallenbeck*, 878 A.2d at 1018; *State v. Rupert*, 649 A.2d 1013, 1015 (R.I.1994); *State v. Williams*, 432 A.2d 667, 670 (R.I.1981). "Thus, errors not asserted in the trial court will only be considered under extraordinary circumstances wherein a defendant has 'suffered an abridgment of his basic constitutional rights.'" *Williams*, 432 A.2d at 670 (quoting *State v. Frazier*, 103 R.I. 199, 201, 235 A.2d 886, 887 (1967)). We are satisfied that such an extraordinary circumstance is not present in this case. Indeed, we are hard-pressed to conceive of a case in which defense counsel's deliberate decision to waive filing a motion for a new trial amounts to plain error under any circumstance. When counsel notified the trial justice that a new-trial motion would not be filed, a challenge to the sufficiency of the evidence purposely was waived.

## II

### Jury Instructions

▆ The defendant next contends that the trial justice erred in his instructions to the jury, resulting in what defendant characterizes as a "second tier" to his burden of proof with respect to an insanity defense. In a criminal case, the state bears the burden of proving all the elements of murder beyond a reasonable doubt, but a defendant who raises an insanity defense bears the burden of proving, by a preponderance of the evidence, that his insanity or diminished capacity "prevented him from forming the required intent and malice essential for conviction on the murder charge." *State v. Barrett*, 768 A.2d 929, 947 (R.I.2001). Carpio suggests that he was deprived of an insanity defense because the trial justice inappropriately incorporated a value judgment into the jury instructions, thereby grafting

an additional element onto defendant's burden of proof. Chiefly, Carpio contends, the jury was informed that in order to excuse his criminal conduct, the degree of his mental impairment must satisfy the community's sense of justice. The defendant argues that it is *"not* for a jury to determine, in accordance with their own views of the 'community's sense of justice' or 'standards of blameworthiness' what 'level or degree of impairment[ ] is required in order to shield [a] defendant from criminal responsibility for his actions.'" [8] This argument is incorrect and is not an accurate reflection of our law.

"The standard of review for jury instructions is well settled. A charge 'need only adequately cover[ ] the law.'" *State v. Cardona,* 969 A.2d 667, 674 (R.I. 2009) (quoting *State v. Krushnowski,* 773 A.2d 243, 246 (R.I.2001)); *see State v. Imbruglia,* 913 A.2d 1022, 1030 (R.I.2007) (holding that the trial justice must adequately cover the law when instructing a jury and must correctly state applicable law). This Court examines "the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, * * * and * * * review[s the] challenged portions * * * 'in the context in which they were rendered.'" *Cardona,* 969 A.2d at 674 (quoting *Krushnowski,* 773

A.2d at 246); *see Hallenbeck,* 878 A.2d at 1007 (citing *State v. Ibrahim,* 862 A.2d 787, 796 (R.I.2004)). "The trial justice is bound to ensure that the jury charge 'sufficiently addresses the requested instructions and correctly states the applicable law.'" *State v. Sivo,* 925 A.2d 901, 913 (R.I.2007) (quoting *State v. Coleman,* 909 A.2d 929, 938 (R.I.2006)). However, "[a]n erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." *Id.* (quoting *Saber v. Dan Angelone Chevrolet, Inc.,* 811 A.2d 644, 653 (R.I.2002)).

The defendant argues that "[a] second tier of proof, one that subjects the defense to the additional test of whether a particular disposition satisfies 'the community's sense of justice,' is simply not what a jury is supposed to do" and that the "jury only gets to determine whether the requisite level of impairment was, in fact, proven." The defendant asserts that the language used in *State v. Johnson,* 121 R.I. 254, 266, 399 A.2d 469, 476 (1979), in which this Court adopted the American Law Institute's Model Penal Code definition of insanity, was intended to "explain the rationale for substituting the Model Penal Code standard for the outdated M'Naghten [Rule]" [9] and was not intended to be incorporated into jury instructions.

---

8. On appeal, defendant challenges the following language employed by the trial justice concerning Carpio's criminal responsibility:
 "[Criminal responsibility is] not a medical question. It's a legal question. It is entrusted to you for your determination in light of the community standards of blameworthiness.
 "In other words, from the evidence presented you must measure the extent, if any, to which the defendant's mental processes were impaired. Then you must assess any *such impairment and decide whether or not,* in your collective judgment, that impairment should exempt this defendant from criminal responsibility.

"Substantial impairment does not mean total impairment. Impairment is a matter of degree. It is for you jurors, who possess and reflect the community's sense of justice, to determine the level or degree of impairment which is required in order to shield this defendant from criminal responsibility for his actions."

9. Prior to *State v. Johnson, M'Naghten* was the prevailing test for determining criminal responsibility based on "whether the defendant had the capacity to know right from wrong in respect to the particular act charged." *State v. Johnson,* 121 R.I. 254, 260 n. 3, 399 A.2d 469, 472 n. 3 (1979) (quoting

■ As we set forth in *Johnson*, 121 R.I. at 267, 399 A.2d at 476, the test for determining criminal responsibility provides:

"A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is so substantially impaired that he cannot justly be held responsible."

In abandoning the *M'Naghten* Rule for the Model Penal Code standard, this Court recognized that "[t]he greatest strength of our test is that it clearly delegates the issue of criminal responsibility to the jury, thus precluding possible usurpation of the ultimate decision by the expert witnesses." *Id.* at 267–68, 399 A.2d at 476. Under the Model Penal Code rubric, "the jury's attention is appropriately focused upon the legal and moral aspects of responsibility because it must evaluate the defendant's blameworthiness in light of prevailing community standards." *Id.* at 268, 399 A.2d at 476–77. We also noted that "[a]t bottom, the determination whether a man [or woman] is or is not held responsible for his [or her] conduct is not a medical [decision] but a legal, social or moral judgment." *Id.* at 266, 399 A.2d at 476 (quoting *United States v. Freeman*, 357 F.2d 606, 619 (2d Cir.1966)). We further quoted *Freeman*, 357 F.2d at 619–20:

"Ideally, psychiatrists—much like experts in other fields—should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused—his characteristics, his po-

tentialities, his capabilities. But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts." *Johnson*, 121 R.I. at 266–67, 399 A.2d at 476.

The current formulation for determining criminal responsibility "emphasizes that the degree of 'substantial' impairment required is essentially a legal rather than a medical question" and therefore, "the precise degree demanded is necessarily governed by the community sense of justice as represented by the trier of fact." *Johnson*, 121 R.I. at 268, 399 A.2d at 477; *see also Barrett*, 768 A.2d at 935 (same). Thus, "[i]t has been stated that the criminal law reflects the moral sense of the community." *Johnson*, 121 R.I. at 256, 399 A.2d at 470–71.

The significant role of the jury as the trier of fact and as a body that is representative of society as a whole is inherent in the language contained in *Johnson*, and throughout our jurisprudence in insanity defense cases. *See Johnson*, 121 R.I. at 266–68, 399 A.2d at 476–77. In *State v. Collazo*, 967 A.2d 1106 (R.I.2009), we noted:

"In determining the issue of responsibility the jury has two important tasks. First, it must measure the extent to which the defendant's mental and emotional processes were impaired at the time of the unlawful conduct. The answer to that inquiry is a difficult and elusive one, but no more so than numerous other facts that a jury must find in a criminal trial. Second, the jury must assess that impairment in *light of com-*

Brakel & Rock, *The Mentally Disabled and the Law* 379–80 (rev.2d ed.1971)); *see State v. Andrews*, 86 R.I. 341, 351–52, 134 A.2d 425, 431 (1957) (intimating that the *M'Naghten*

test was the prevailing view in Rhode Island); *State v. Quigley*, 26 R.I. 263, 276, 58 A. 905, 910 (1904) (adopting the *M'Naghten* test).

*munity standards of blameworthiness.* The jury's unique qualifications for making that determination justify our unusual deference to the jury's resolution of the issue of responsibility." *Id.* at 1110 (quoting *Johnson,* 121 R.I. at 270, 399 A.2d at 478) (emphasis added).

*See also Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940) (noting that "[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community"). Therefore, the trial justice's inclusion of language such as "community sense of justice" and "blameworthiness" in the jury instructions did not graft an additional element onto defendant's burden of proof; the language merely elucidated the role of the jury in passing on the merits of the defense. Simply put, "community standards of blameworthiness" constitute the backdrop against which the defendant's degree of impairment˚ is measured—it reflects the essential role of the fact finder in an insanity defense case.

Accordingly, we are satisfied that the trial justice's instructions not only properly included reference to the "community sense of justice," but also adequately covered the law.[10] *See State v. Hazard,* 797 A.2d 448, 469 (R.I.2002) (holding that a trial justice "need only adequately cover [ ] the law" (quoting *Krushnowski,* 773 A.2d at 246)). The trial justice coherently articulated the three factors as promulgated in *Johnson,* to determine whether defendant possessed the mental capacity to be held criminally responsible for his actions.[11]

 After considering all of the evidence, the jury returned a unanimous guilty verdict, concluding that Carpio was not suffering from a mental disease or defect at the time he committed the crimes. "In determining the correctness of a jury charge, 'we determine how a jury composed of ordinarily intelligent persons listening to that instruction at the close of trial would have [interpreted] the instructions as a whole.'" *State v. Perry,* 770 A.2d 882, 885 (R.I.2001) (quoting *State v. Parkhurst,* 706 A.2d 412, 418 (R.I.1998)). Having examined the jury instructions in their entirety and in context, as is our function, we are satisfied that the trial justice did not err; he provided the jury with a correct explanation of the law as it relates to mental impairment and defendant's criminal responsibility.

---

10. The trial justice's instructions concerning criminal responsibility encompassed our Model Penal Code test by stating:

"A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness or his conduct or to conform his conduct to the requirements of the law were so substantially impaired that he cannot justly be held responsible."

His instructions also went on to enumerate the factors the jury was to consider in making its determination:

"First, whether, in fact, the defendant suffered from a mental disease or defect when he committed the offense alleged.

"Secondly, whether such a mental disability resulted in a substantial impairment of his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law; and,

"Thirdly, whether there existed in your judgment a sufficient relationship between that mental disability and the criminal conduct such that you believe that the defendant cannot justly be held responsible for his actions."

11. The instructions also advised the jurors to consider all of the evidence, including conflicting testimony of the various witnesses. The jurors were informed that they should assign weight and credibility to the testimony and evidence presented in order to determine Carpio's level of criminal responsibility.

## III

### Life Imprisonment Without Parole

 The defendant's final issue on appeal concerns the imposition of a sentence of life imprisonment without the possibility of parole. Carpio argues that the sentence is excessive and unwarranted. We disagree. The defendant contends that this Court should reduce his sentence to life imprisonment with the possibility of parole because he is not beyond rehabilitation. He also argues that his mental illness is a mitigating factor causing the sentence imposed upon him to be excessive. Citing the provisions of G.L.1956 § 12–19.2–5, Carpio requests that this Court undertake a review of his sentence and reduce it accordingly.

 A sentence of life imprisonment without parole is the most severe sentence authorized by Rhode Island law. *State v. Tassone*, 749 A.2d 1112, 1121 (R.I. 2000). Such a harsh sentence is "reserved for the most heinous murders, when special circumstances are found by the jury, including, *inter alia*, felony murder, murder for hire, murder involving torture or aggravated battery, or the murder of a police officer." *State v. Monteiro*, 924 A.2d 784, 795 (R.I.2007) (citing G.L.1956 § 11–23–2).[12] When a case involves the imposition of a sentence of life without parole, "it is incumbent upon this Court to exercise its own independent judgment and discretion in determining the appropriateness of the sentence." *Tassone*, 749 A.2d at 1119. This Court, "after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment." Section 12–19.2–5.[13] The Court will "look to the record, the jury's findings, the trial justice's conclusions, and the character and propensities of the defendant, including any aggravating circumstances as well as any mitigating factors." *State v. Graham*, 941 A.2d 848, 866 (R.I.2008); *State v. Quinlan*, 921 A.2d 96, 111–12 (R.I.2007); *see* § 12–19.2–4.

 We undertake this review cognizant that Carpio was found guilty of murdering a police officer. The United States Supreme Court has acknowledged that "the fact that [a] murder victim was a peace officer performing his regular duties may be regarded as an aggravating cir-

12. General Laws 1956 § 11–23–2 provides in pertinent part:

"Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree: (1) committed intentionally while engaged in the commission of another capital offense or other felony for which life imprisonment may be imposed; (2) committed in a manner creating a great risk of death to more than one person by means of a weapon or device or substance which would normally be hazardous to the life of more than one person; * * * (5) committed against any member of the judiciary, law enforcement officer, corrections employee, assistant attorney general or special assistant attorney general, or firefighter arising from the lawful performance of his or her official duties * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment."

13. Setting forth this Court's standard of review for a sentence of life imprisonment without parole, G.L.1956 § 12–19.2–5 states:

"The defendant shall have the right to appeal a sentence of life imprisonment without parole to the supreme court of the state in accordance with the applicable rules of court. In considering an appeal of a sentence, the court, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment."

cumstance" in sentencing because of society's "special interest in affording protection to [those] * * * who regularly must risk their lives in order to guard the safety of other persons and property." *Roberts v. Louisiana*, 431 U.S. 633, 636, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). By including the murder of a police officer acting in the line of duty as an offense qualifying for the harshest penalty under our law, the General Assembly has recognized society's strong interest in protecting the safety of those who risk their lives to protect the public. The General Assembly has determined that the murder of a police officer in the performance of his or her duties warrants a sentence of life imprisonment without the possibility of parole, subject to this Court's review of that sentence.

After our independent and thorough examination of the record in this case, we are of the opinion that the imposition of a sentence of life imprisonment without parole was appropriate; we conclude that the crime and the offender squarely fit within the narrow category of cases for which such a sentence is reserved. *See Graham*, 941 A.2d at 866; *State v. Brown*, 898 A.2d 69, 86 (R.I.2006); *see also* § 11–23–2. We are confronted with the brutal murder of a twenty-seven-year law enforcement veteran, committed with the officer's own firearm, by an offender who abused drugs and has a history of violent crime. Neither defendant's past conduct nor the circumstances of this heinous offense warrant a reduction in sentence, nor are we persuaded that the punishment is disproportionate to the crime. *See Monteiro*, 924 A.2d at 795 (noting that "[a] criminal sentence is disproportionate 'if the sentence itself is unduly harsh when compared with the crime'" (quoting *McKinney v. State*, 843 A.2d 463, 470 (R.I.2004))). In passing on the evidence in this case, the jury was required to assess defendant's mental state in light of the expert testimony pre-

sented; the jury found that defendant did not suffer from a mental disease or defect that would have warranted a finding of not guilty by reason of insanity. Additionally, our review of the record convinces us that the aggravating factors in this case far outweigh the dearth of mitigating circumstances that might give rise to leniency.

A fair reading of the transcript discloses Carpio's calm, calculated, and often cunning behavior throughout that fateful day—including his several conscious efforts to escape and evade arrest. From the time he placed a hat and a scarf over his face to conceal his identity before attacking Mrs. Gatta, until he ran from the cab driver, Carpio acted shrewdly and decisively. His mental prowess also was manifest when, after assaulting Mrs. Gatta, he exchanged the red van—the getaway vehicle—for another vehicle, indicating that he was aware of his wrongful conduct and that he deliberately tried to evade apprehension. The defendant repeatedly lied to police about his identity and criminal history. His sly request for a drink of water in order to cause Det. McGann to be absent from the conference room, as well as his savvy escape from police headquarters, also are noteworthy. After locking the door from the inside and shooting Det. Allen, Carpio had three possible means of egress; the first two options, running into the hall where many armed officers were waiting or jumping four stories from the conference room window onto concrete, would have led to capture or severe injury, whereas the third option—shooting out the window of the adjoining office and jumping onto a grassy surface—afforded a slightly safer getaway.

Additionally, Dr. Kelly's testimony, which the trial justice relied on, revealed that there was no evidence that defendant suffered a mental defect or disease that

interfered with his thought process.[14] Doctor Kelly concluded that Carpio "did not have a mental disease which substantially impaired his capacity to conform his conduct" and that his behavior was "not the type of behavior one would expect of someone who is acutely in the throes of a mental illness."

Before sentencing, the trial justice reviewed the presentence report, the attorney general's sentencing memorandum, and various correspondence from interested persons. At the sentencing hearing, the trial justice heard from Mrs. Gatta, Det. Allen's wife, members of the Providence Police Department, Carpio's grandmother, aunt, and mother; he also listened to the arguments of counsel for the state and the defense. Carpio also addressed the court. The trial justice gave consideration to defendant's criminal record, his personal history, and his character—taking special note of the fact that defendant abused drugs, had accumulated a large number of disciplinary infractions while awaiting trial at the ACI, and, significantly, Dr. Kelly's opinion that Carpio "has failed to conform to appropriate standards of social and legal behavior * * * [and has] demonstrate[d] patterns of manipulation, insensitivity to others and lack of remorse for his behavior." The trial justice incorporated Dr. Kelly's testimony into his decision, noting that Carpio had "a history of violence directed at others, as well as substance abuse, and no record of sustained legitimate employment in the five years prior to the events."

In rendering his decision, the trial justice stated:

"I considered the nature and circumstances of the offense. I considered the defendant's personal history, his criminal record and his character. I considered issues such as deterrence, both individual as well as general. I considered whether or not this defendant is susceptible to rehabilitation. I considered whether or not he is of true remorse, and I considered whether he is able to take his place in a civilized society."

Despite Carpio's expressions of remorse during his sentencing[15]—which Carpio has asserted is a mitigating factor—the trial justice concluded that "the defendant cannot control himself and that "[t]he release of Esteban Carpio on parole would be gravely antithetical to a civilized society and would do scant justice to the law enforcement community." The trial justice further remarked that "[a]ssaults on the elderly and the murder of a police officer are crimes that demand justice, and in this time of great danger to our society, we must reinforce in the minds of criminals that those types of offenses will be met with condemnation and with punishment that fits the crime."

After a measured and independent examination of the record, we are not persuaded that Carpio's sentence should be reduced to life imprisonment with the pos-

---

14. Carpio also admitted using ecstasy and marijuana. Further, after an examination of Carpio two weeks prior to the crime, medical personnel at Faulkner Hospital determined that defendant's hearing noises and his sleeplessness were likely the result of substance abuse. After careful review of that hospital report, Dr. Kelly noted that no medical professional had observed any signs of psychosis—the report stated that defendant engaged in relevant conversation, made good eye contact, and denied any auditory or visual hallucinations.

15. Carpio did express his remorse for the murder of Det. Allen, stating: "There is nothing I can do or say to show my condolence to the family for the wrong I've done. I am truly sorry for what has happened to the victims' families."

sibility of parole. The murder of a police officer carrying out his regular duties is, in all respects, a horrific and aggravating circumstance warranting a sentence of life without parole. *See Roberts,* 431 U.S. at 636, 97 S.Ct. 1993; § 11–23–2. We are not convinced that Carpio is capable of rehabilitation in light of his criminal record,[16] the jury's verdict, and the trial justice's sentencing considerations. *See State v. Sifuentes,* 996 A.2d 1130, 1138 (R.I.2010) (indicating that the defendant's character, record, and propensity for criminal activity made rehabilitation unlikely); *Graham,* 941 A.2d at 867 (same). Any hope of the defendant's rehabilitation is far outweighed by his danger to the community and the indelible scar this offense has left upon the law enforcement community and the people of Providence.

### Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction and ratify the imposition of a sentence of life imprisonment without the possibility of parole. The papers in this case may be returned to the Superior Court.

16. The assistant attorney general recounted during the sentencing hearing that Carpio had been arrested fifteen times between 2000 and 2005. The trial justice took into account that the reports related to the arrests indicated an escalation in Carpio's violent and anti-social behavior, despite the dismissal of a number of the charges.